[No. B071438. Second Dist., Div. Four. Jan. 12, 1994.]

THE PEOPLE, Plaintiff and Respondent, v.
JUAN ESPINOSA CARDENAS, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, B, C and D.

## Counsel

David H. Goodwin, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Tricia Ann Bigelow, John R. Gorey and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

HASTINGS, J.—Juan Espinosa Cardenas held himself out to be a "curandero," or faith healer, and rendered "treatment" to various female believers of the religion Curanderismo. His activities under this guise led to his conviction of six counts of grand theft (Pen. Code, § 487) and seventy counts of sexual misconduct (Pen. Code, §§ 289; 266c; 261, subd. (a)(2);

288, subd. (a); 288, subd. (b)), and findings that he occupied a position of special trust (Pen. Code, § 1203.066, subd. (a)(9)).[1]

Appellant challenges the convictions for count 2, penetration of the genital or anal openings of Selsa P. by a foreign object (§ 289, subd. (a)); and counts 20 through 36, forcible lewd act upon Maricela P., a child under 14 years of age (§ 288, subd. (b)), by penetration of the genital or anal openings by a foreign object (counts 21 through 23) and sexual intercourse (counts 24 through 36). The trial court imposed the middle term of six years on count 2, and seventeen consecutive six-year terms on counts 20 through 36, as required by section 667.6.[2]

For each of the challenged convictions, appellant contends that the evidence was insufficient to support findings of the element of "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person" common to both subdivision (a) of section 289 and subdivision (b) of section 288. He argues that the offenses could be no more than consensual penetration, though procured by fraud (§ 266c), and non-forcible lewd acts on a child under 14 years of age (§ 288, subd. (a)).[3] The sentencing requirements of section 667.6 do not apply to the latter offenses. (§ 667.6; *People* v. *Cicero* (1984) 157 Cal.App.3d 465, 473 [204 Cal.Rptr. 582].) He also contends that the trial court prejudicially erred when it failed

[1]All statutory references are to the Penal Code unless otherwise indicated.

[2]Section 667.6 provides in pertinent part: "(d) A full, separate, and consecutive term shall be served for each violation of . . . subdivision (b) of Section 288 [or] Section 289 . . . if the crimes involve separate victims or involve the same victim on separate occasions. [¶] . . . [¶] The term shall be served consecutively to any other term of imprisonment, and shall commence from the time the person otherwise would have been released from imprisonment. The term shall not be included in any determination pursuant to Section 1170.1. Any other term imposed subsequent to that term shall not be merged therein but shall commence at the time the person otherwise would have been released from prison."

[3]Section 266c, for the time frame involved, provides: "Every person who induces any other person, except the spouse of the perpetrator, to engage in sexual intercourse [or] penetration of the genital or anal openings by a foreign object, substance, instrument, or device . . . when his or her consent is procured by false or fraudulent representation or pretense that is made with the intent to create fear, and which does induce fear, and that would cause a reasonable person in like circumstances to act contrary to the person's free will, and does cause the victim to so act, is punishable by imprisonment in a county jail for not more than one year or in the state prison for two, three, or four years. [¶] As used in this section, 'fear' means the fear of unlawful physical injury or death to the person or to any relative of the person or member of the person's family."

Section 288, subdivision (a) provides: "Any person who shall willfully and lewdly commit any lewd or lascivious act including any of the acts constituting other crimes provided for in Part 1 of this code upon or with the body, or any part or member thereof, of a child under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of the child, shall be guilty of a felony and shall be imprisoned in the state prison for a term of three, six, or eight years."

to give a requested lesser included offense instruction, admitted statements he made to a police officer, and allowed reading of testimony to the jury in his absence without obtaining his personal waiver.

After reviewing the record in its entirety, we conclude that substantial evidence supports the findings of the jury, and that his other contentions are without merit.[4]

## I

### REVIEW OF THE EVIDENCE

This case involves an abuse of a position of trust reposed in appellant by his victims. Because of the nature of the crimes alleged and how they were carried out, it is necessary for us to review the facts relating to the establishment of this position of trust and the acts undertaken by appellant relating to Selsa and Maricela and counts 2 and 20-36.

### A. *The Religion of Curanderismo*

Ysamur Flores, an expert in folklore and mythology, was called as a witness by the People. He testified regarding the folk religion Curanderismo, a religion based upon the belief in spirits, the healing power of plants, and the ability of a person to mediate between those powers and the followers of the religion. Curanderismo is common to Mexico, Central America and Panama. Followers of the religion have immigrated to the United States as have curanderos, persons versed in the religion who are mediators or healers.

A curandero's status is that of a holy man. He is a confidant of those who believe in this religion and the followers will talk about problems with him they do not want anyone else to know about. His holiness gives him the status to mediate important problems of the community. Curanderos are "validated" through practice, and word spreads when a person has been "cured" by a curandero. Those who are cured recommend him to others.

A believer may go to a curandero for a number of reasons, including health problems, love problems, marital problems and business-related problems. A visit is generated by a pressing need to talk to someone who has access to divine powers. Followers believe that people, including whole

---

[4]Appellant states in his brief: "For the sake of brevity, this discussion is primarily concerned with these counts [2, 20 through 36], although the same principles apply to the other counts for which appellant received concurrent sentences." Contentions which are merely suggested are not considered. (Cf. *Do It Urself Moving & Storage, Inc.* v. *Brown, Leifer, Slatkin & Berns* (1992) 7 Cal.App.4th 27, 35 [9 Cal.Rptr.2d 396].)

families, and unborn children as well as objects can be cursed. They also believe that the curandero is a "seer" and a mind reader who can tell just by looking at a person whether something is wrong with the person and whether the person may die soon. It is also believed that curanderos, by looking at one member of a family, can tell whether other members of the family may be sick or about to die. If the curandero learns through spiritual intervention that the person's death is ordained by God to occur at that time, the curandero will not intervene. However, if it is not the time ordained by God, then the curandero can intervene to help the person to recover and prevent death.

The curandero utilizes a number of tools in treatment of the person, including candles of different colors and shapes, herbs, tree branches, rum to cleanse and purify the body, skulls, beads and other such items. Treatments can be performed while the followers are naked; however, it is done in such a way that it does not promote sexual arousal.

A very stringent taboo in the religion with respect to the actions of the curandero is the performance of sexual acts with the patient because it deprives the healer of the energy necessary to perform his duties and also desecrates the work.

## B. *Selsa, Count 2*

Count 2 related to the initial "treatment" rendered to Selsa P. Selsa was a twenty-six-year-old widow, the mother of two sons, ages four and six, and had less than an eighth grade education. She spoke little English. Count 2 charged appellant with genital penetration by foreign object, that is by finger, fingers, or hand, in violation of section 289, subdivision (a).[5]

Early in February 1990, Selsa hired Celia H. to take care of her children while she was at work, and Celia moved into Selsa's apartment. Celia had been receiving a "cure" from appellant. She reposed confidence in him and believed that he was a curandero. Appellant told Celia that Selsa was very ill and that Celia could not continue to live with Selsa unless Selsa accepted a cure.

---

[5]Section 289, subdivision (a) provides: "Every person who causes the penetration, however slight, of the genital or anal openings of any person . . . for the purpose of sexual arousal, gratification, or abuse by any foreign object, substance, instrument, or device. when the act is accomplished *against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person* . . . shall be punished by imprisonment in the state prison for three, six, or eight years." (Italics added.) Subdivision (k) of section 289 provides: "As used in this section, 'foreign object, substance, instrument, or device' shall include any part of the body, except a sexual organ."

In mid-February 1990, Celia took Selsa to meet appellant. Selsa at this time felt weak and very depressed, and she did not want to live. In 1989, Selsa had attempted suicide. Selsa met with appellant for about three hours. He told her he was a curandero and that she was very ill and had only one or two months to live. He also told her that if she agreed to have him cure her, her entire life would change, but if she did not accept the cure, she would die. Selsa had visited a curandero in Mexico when she was about 20 years old and understood that a curandero could render beneficial treatment. She believed appellant and believed that he was capable of curing her. However, he would not tell her what type of treatment he would render.

Later that same day, appellant brought red, black and white candles and other materials to the apartment. He placed the candles in a circle and lit them, explaining that this act started the cure. He told Selsa that when the candles burned down, a pact with the devil would exist, and that once the pact was made, she could not change her mind. He read from a book that contained the faces of the devil, put it away, and said, "You can't back out now." He told her that the beings with whom she had made the pact could kill them. She believed him and was scared. Later that evening, he made Selsa drink wine so that she "could cry" and "let everything out." She became very drunk.

The next morning, Selsa was dizzy. Appellant gave her a "purgent" and ordered her to drink it to cause her to vomit, which he claimed was part of the cure. She did as she was told, vomited and became very weak and sleepy. Later that afternoon, she was still a little dizzy. Acting under appellant's directions, and with his repeated assurances that each step was part of the cure, she reluctantly undressed and lay on her bed. Appellant did not tell her what he was going to do, and she thought he was going to examine her stomach. Instead, he placed a substance, which Selsa described as a cream, inside her vagina, using his bare hand.

Appellant testified on his own behalf. He agreed to help Selsa with a cure which included placing his fingers inside her vagina, but only after receiving her explicit consent. He did this four times, on March 1, March 7, March 14 and March 21, 1990. These four occasions made up the charges brought under counts 4-7 relating to violations of section 266c. He denied the acts constituting count 2, the initial treatment as testified to by Selsa.

### C. *Maricela*

Counts 20 through 36 charged appellant with forcible lewd acts upon Maricela (§ 288, subd. (b)).[6] Counts 20 through 23 alleged that the offense was accomplished by penetration of Maricela's genital or anal openings by a foreign object on and between April 1, 1990, and July 30, 1990. Counts 24 through 32 alleged that the crime was accomplished by sexual intercourse with Maricela on and between April 1, 1990, and July 30, 1990, and counts 33 through 36 alleged sexual intercourse on and between July 31, 1990, and August 31, 1990.

In April, only Selsa and Celia were living in the apartment because appellant had told Selsa that her children could not live there. He told her the children could be killed by being locked in their room and then thrown out the window by bad spirits. On one occasion, appellant had kicked open the door to the children's room, representing that it somehow had been mysteriously locked from the inside. He also appeared to be able to make stuffed dolls walk. Selsa sent the children to live with her mother.

Sometime in April 1990, Maricela, Selsa's 13-year-old sister, came to live with Selsa and Celia because appellant had advised Selsa that Maricela was ill and must be taken out of school to be cured or she would die. Appellant said he would let Maricela leave after one week; however, he did not allow this to occur, and, in fact, "treated" her every day until she left the apartment sometime in August 1990. He also insisted that Maricela always wear a nightgown.

Selsa witnessed appellant's first "treatment" of Maricela. Appellant wanted Selsa present because Maricela was afraid, and Selsa calmed her. At his direction, Maricela undressed. Appellant then touched her vagina and said she was not a virgin. Maricela said she was. Selsa told him not to do anything to Maricela. Appellant said he had to because she was very sick. He continued to touch her in various private locations on the body and told Maricela she was going to become insane and he had to take her out of school because she was going to be killed. She believed him. She asked him who was going to kill her. Appellant did not answer the question.

Appellant returned to the apartment later in the day while Selsa was at work, directed Celia and Maricela to lie down on the floor in the living room

---

[6]Subdivision (b) of section 288 provides: "Any person who commits an act described in subdivision (a) [*ante* at footnote 3] by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person, shall be guilty of a felony and shall be imprisoned in the state prison for a term of three, six, or eight years."

with him, and then made noises in other rooms like he was throwing the children's toys. Maricela was scared. When Selsa returned, appellant made all of them lie down together until about 4 a.m. Maricela did not sleep because appellant would not let them, saying that bad spirits would take away their spirits.

At appellant's direction, Selsa told her mother (also Maricela's mother) that Maricela could not return home because she was very sick and would be killed if she did not leave school. The mother had met appellant previously, and he had given her a treatment that Selsa had not witnessed. The mother came to the apartment to see how Maricela was doing. Selsa did not tell her mother what appellant had done to Maricela.

The next day, appellant told Maricela she could not go to school because she was going to be killed and he could prevent this. She believed him. Maricela remained in the apartment because appellant told her she had to stay. Appellant then touched Maricela's breasts and again inserted his fingers into her vagina. He told her she had demons inside her and again told her she was going to become insane. She did not want him to touch her. She was scared and nervous. Almost every day during April 1990, he touched her in the same way. Sometimes Celia was present and sometimes Selsa. Selsa witnessed appellant touching Maricela in this manner more than 20 times. She also saw appellant pour a liquid from a bottle marked "alcohol" into Maricela's vagina. Maricela would scream and cry, but Selsa could do nothing because it was part of the cure. Selsa and Celia received the same treatment. When Maricela complained to Selsa, Selsa would tell her she had to bear this because it was part of the cure.

In May 1990, appellant changed the nature of the "treatment" and told Maricela she would feel something going inside of her and when he did this the bad spirits she had inside would come out. He told her he was covering her eyes with a handkerchief because bad spirits were going to appear. When Maricela felt appellant's penis go into her vagina, she pushed him away with her hand. Appellant became angry and told her not to take the blindfold off for five minutes. He told her not to tell anyone or else family members involved in a cure would die. The next day, appellant blindfolded Maricela and told her she was again going to feel something inside her but if she pushed him, everything was going to stop, the cure would end, and Selsa, Celia, and she would die. Maricela was afraid. Appellant got on top of her and put his penis inside. This hurt a lot and she would tell him, "No." He ignored her. She grabbed a pillow and squeezed it. Appellant had sexual intercourse with Maricela every day in May, and about three times a week in

June, July and August. Despite the fact that this caused her pain, appellant would not let her go to a doctor because he did not believe in doctors.

At trial, appellant testified Maricela did not need healing during the time she lived with Selsa and he had not touched her for any reason.

### D. *The Psychological Coercion and Physical Deprivation*

During this entire time, appellant continued his psychological control over the women. He told all three women not to go near the windows because bad spirits would throw them out. He told them not to leave the apartment or they would be killed, not to go into the bedrooms without him because those rooms were inhabited by bad spirits, not to go into the kitchen until he said they could, not to watch television, not to use the telephone, and told them they must always be together if one of them used the bathroom because if one went alone she could be taken and killed. The women slept together in the living room. Appellant took the keys to the apartment from Selsa and locked the three women inside. Appellant paid the rent money to the landlord. Selsa only left the apartment in appellant's company and bought what he indicated. No food was prepared until appellant arrived in the evening. He told them what they could eat. At appellant's direction, Selsa had the telephone number for the apartment changed twice.

Appellant arrived at the apartment every day at about 6 p.m. and stayed as late as 2 a.m. He first treated the women together and then separately in different rooms. When he arrived, he would give them something to eat and herbs in tea to drink to "cleanse" their stomachs. He also gave them pills. At his direction, all three would lie naked on a blanket on the floor in the living room in the dark and pray. Appellant remained dressed. He covered the door to the kitchen with a blanket. Though appellant was in the living room, loud noises came from the kitchen. Appellant told them the noises were bad spirits and devils and that if the women moved they would be killed. He said he was going to fight the bad spirits from the kitchen, and he would act "as if he had the devil." He told them that if he tried to attack them, they should throw holy water on him. He tried to choke them, especially Maricela. They would put holy water on him. He described these events as "exorcisms," and he performed them every night. Afterwards, he sent each woman to a separate room and the doors would be closed. At his direction, they remained naked in their rooms, sometimes for hours, and could not leave until he gave them permission.

## II

## DISCUSSION

### A. *The Issue of Force, Duress, etc.*

 In summary, despite the fact appellant testified at trial that he never touched Maricela and that he did not do the acts supporting count 2, he now argues that all of the acts with Selsa and Maricela were consensual and no physical force was used and therefore the evidence was insufficient to support the convictions for count 2 (Selsa, § 289) and counts 20-36 (Maricela, § 288, subd. (b)). In connection with this argument, appellant asserts that, at most, he obtained consent of Selsa and Maricela for the sex acts by means of fraud, which does not fall within the concept of forcible sexual acts contemplated in sections 289 and 288, subdivision (b). ██ ██ Therefore, as to Selsa, his conviction could only have fallen within the terms of section 266c, and as to Maricela, he could only have been convicted under section 288, subdivision (a).[7]

This argument is premised on the basis that by adopting section 266c in 1985 the Legislature recognized a difference between a sexual act obtained by fraud and a sexual act obtained by means of "force, violence, duress, menace, or fear of immediate and unlawful bodily injury" as required under both sections 289 and 288, subdivision (b). This argument was initially referenced in appellant's opening brief, although it was not fully developed. At oral argument, we noted that respondent had failed to respond to this argument and requested further briefing on the issue, which we subsequently received.

Basically, appellant contends that his victims believed he was a curandero and voluntarily submitted themselves to the treatment he rendered for the purpose of exorcising any illnesses from their body. If the case were that simple, we might agree with appellant. However, his argument has two basic flaws. First, while it is true that the initial consent to submit to treatment was obtained by appellant's false representations that he was a curandero and the

---

[7]We note at the outset that appellant incorrectly focuses upon the concept of fraudulently obtained consent on the counts relating to Maricela. At the time of the offenses, Maricela was 13 years of age. Consent, or a reasonable good faith belief in the age of a child to give consent, is not a defense to crimes charged under section 288. (*People* v. *Olsen* (1984) 36 Cal.3d 638, 647-648 [205 Cal.Rptr. 492, 685 P.2d 52].) Therefore, consent is not an issue whether it be fraudulently obtained or freely given. The only issue is whether the actions of appellant relating to Maricela fell within the terms of section 288, subdivision (b).

victims needed treatment, their initial consent was only to submit to treatment and did not necessarily translate into consent for each of the specific acts he performed on his victims. The evidence clearly establishes that both Maricela and Selsa were reluctant to allow appellant to perform the specific acts for which he was convicted. Secondly, appellant's argument ignores the evidence relating to the psychological and physical deprivations he imposed upon all of his victims to coerce them to submit to specific treatments against their will.

■ "When the sufficiency of the evidence is challenged, a reviewing court must examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence from which the jury could find defendant guilty beyond a reasonable doubt. Substantial evidence must support each essential element of an offense. A judgment of conviction will not be set aside for insufficiency of the evidence to support the jury's verdict unless it is clearly shown there is no basis on which the evidence can support the conclusion of the jury. The credibility of witnesses and the weight to be accorded to the evidence are matters to be determined by the trier of fact. [Citations.]" (*People* v. *Jeff* (1988) 204 Cal.App.3d 309, 324 [251 Cal.Rptr. 135].) ■ We conclude that substantial evidence supports the conviction of appellant for counts 2 and 20-36 on the theory of duress.

Selsa was a widow raising two young children. She had attempted suicide the previous year, was very depressed, and felt "very bad." At the time she was introduced to appellant, she did not want to live. She had little formal education and did not speak English well.

Maricela was only 13 years old. Maricela observed her sister comply with appellant's demands and was told by her that she had to comply to effect the cure. Their mother had visited Maricela in the apartment and had received some undisclosed treatment from appellant. There was no one out of appellant's influence to whom Maricela could turn.

Appellant weakened his victims by administering concoctions of unknown ingredients which acted as purgatives and emetics. He controlled their diet, deprived them of sleep, and coerced them into drinking alcohol. He insisted they lie naked for hours, and he never permitted Maricela to be fully dressed. He isolated the victims by locking them into the apartment, forbidding them to watch television or use the telephone, changing the telephone number, warning them away from windows, coercing Selsa into quitting her job; and also took her jewelry and savings. He would not allow them out of the

apartment, or even into some of its rooms, unless he accompanied them. He paid the rent to the landlord. He would not allow Maricela to get medical treatment when she was in pain, telling her he did not believe in doctors. In other words, appellant created an environment in which his victims were totally dependent on him for their basic needs for a period of six months. He alternated invocations of religious authority with threats of the devil, bad spirits, and death. His powers of persuasion were sufficiently strong that Selsa sent her children away. The fact that not every act of appellant involved his directly touching them is not persuasive that he did not employ force, fear, and duress.

Sections 289, subdivision (a) and 288, subdivision (b) both require the same proof of "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." The issue with which we are presented is whether the actions of appellant fall within any of these terms.

 "[I]n order to establish 'force' within the meaning of section 288, subdivision (b), the People must show 'defendant used physical force substantially different from or substantially greater than that necessary to accomplish the lewd act itself.' [Citation.]" (*People* v. *Pitmon* (1985) 170 Cal.App.3d 38, 46 [216 Cal.Rptr. 221].) "[D]uress as used in the context of section 288 [means] a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." (*Id.* at p. 50.)

The *Pitmon* court addressed the related concepts of force and duress within the meaning of section 288, subdivision (b). "There is some overlap between what constitutes duress and what constitutes force. This is because duress is often associated with the use of physical force, which may, but need not be present to have duress. However, as we have pointed out, the terms cannot be treated synonymously. An application of the previously stated rule of statutory construction dictates that we find that force, as used in the context of section 288, subdivision (b), refers only to physical force. To extend the meaning of that word to cover psychological coercion would be tantamount to rendering the word 'duress' meaningless in that statute." (170 Cal.App.3d at p. 50, fn. 9.)

The term "fear" in the context of these sections has been defined as follows: "(1) 'A feeling of alarm or disquiet caused by the expectation of

danger, pain, disaster, or the like; terror; dread; apprehension' (American Heritage Dict. (1981) p. 480) and (2) 'Extreme reverence or awe, as toward a supreme power' (*ibid.*)." (*People* v. *Montero* (1986) 185 Cal.App.3d 415, 425 [229 Cal.Rptr. 750].)

██ The trial court was requested to and did instruct on the concept of duress, which was consistent with the definition set out in *People* v. *Pitmon*, *supra*. The transcript demonstrates that the prosecution was relying quite heavily upon the theory of duress to prove appellant's guilt against Selsa and Maricela pursuant to sections 289 and 288, subdivision (b). ██ In determining the existence of duress, force or fear, factors such as the position of dominance and authority of the defendant and his continuous exploitations of the victim may be considered. (*People* v. *Pitmon*, *supra*, 170 Cal.App.3d at p. 51; *People* v. *Montero*, *supra*, 185 Cal.App.3d at p. 424.) ██ The evidence reveals that appellant placed himself in a position of trust with Selsa and Maricela as a curandero and was trading on their fears that if they did not allow him to proceed with the "cure" they would remain ill, or worse, risk imminent death to themselves or others. This is not a fear of unlawful bodily injury as contemplated by either sections 289, subdivision (a) or 288, subdivision (b). However, it is clear that appellant utilized this threat of divine intervention to coerce Selsa and Maricela into acquiescence.

In addition, there was evidence of direct physical force. In administering the "strong cure" to Maricela, it was necessary that others hold the victim down when he inserted his hand in her vagina, and a pillow was necessary to stifle her screams. He had performed the same "treatment" on Selsa.

However, appellant also argues that any compliance attributable to his statements was unreasonable. The argument fails. Even unreasonable fear of immediate bodily injury may suffice if the accused knowingly takes advantage of that fear in order accomplish a sexual offense. (See *People* v. *Jeff*, *supra*, 204 Cal.App.3d at pp. 324-325 [sexual intercourse].) In any event, this was a question of fact presented to the jury, and under the circumstances presented—appellant's trading upon strongly held religious beliefs—we will not conclude as a matter of law that the compliance by the victims was unreasonable.

The evidence reflects that appellant created a position of trust, traded upon the women's fears, and created intolerable conditions specifically to weaken his victims, providing him with opportunities to molest and abuse them. Substantial evidence supports the findings of the jury.

*B.-D.*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<h3 style="text-align:center">DISPOSITION</h3>

The judgment is affirmed.

Epstein, Acting P. J., and Vogel (C. S.), J., concurred.

A petition for a rehearing was denied January 26, 1994, and appellant's petition for review by the Supreme Court was denied April 20, 1994. Mosk, J., was of the opinion that the petition should be granted.

---

\*See footnote, *ante*, page 927.