Filed 1/5/15  P. v. Ruiz CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**COPY**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ROBERT ALBERT RUIZ, JR.,<br><br>    Defendant and Appellant. | C072535<br><br>(Super. Ct. No. 11F02654) |

A jury convicted defendant Robert Albert Ruiz, Jr., of five counts of lewd and lascivious acts on a child under the age of 14 (Pen. Code, § 288, subd. (b)(1) ( unless otherwise stated, statutory references that follow are to the Penal Code), four counts of rape of a child under the age of 14 (§ 269, subd. (a)(1)), and one count of sodomy of a child under the age of 14 (§ 269, subd. (a)(3)).  The trial court sentenced defendant to 75 years to life in prison plus 40 years.

On appeal, defendant contends there is insufficient evidence to support his conviction on any of the counts because the complaining witness was not credible.  He

1

also contends there is insufficient evidence of force, fear, duress, or menace to support the rape and sodomy counts. Finally, he contends it was prejudicial error to admit prior uncharged misconduct evidence. We affirm the judgment.

FACTS AND PROCEEDINGS

The Crimes

L.D. is deaf and was 15 when she testified. She met defendant, who is also deaf, at her school in the fifth grade. She later met defendant's wife and four children. Two of defendant's children are deaf and L.D. used to play with them. Defendant's children were the only deaf children with whom she could play.

L.D. started going over to defendant's house, where she sometimes spent the night. Defendant started touching L.D. inappropriately when she was in the fifth grade. The first instance happened when she was in the bathtub. Defendant's family was asleep. Defendant entered the bathroom, closed the door, and disrobed. After closing and locking the door, he then got into the tub and said, "[w]e are going to have some fun," and touched her vagina. Even though she repeatedly told him no, defendant kept begging her to touch his penis and she relented. Defendant told her not to tell anyone about what happened.

Defendant and his family moved to another house when L.D. was 12. She was in the garage with defendant one evening when he showed her some pornography on a laptop computer. As they watched, defendant told L.D. he wanted to have sex with her. When the video was over, defendant said that he showed her the video to teach her how to do it. After closing the laptop, defendant tried to undress L.D. and touch her breasts. L.D. told defendant she did not want to do it. Defendant removed his and L.D.'s clothing before kissing her lips and breasts. He eventually placed his penis inside L.D.'s vagina; she tried to cross her legs and push him off, but defendant told her not to move. When she tried to scream, defendant covered her mouth and told her not to make any noise.

2

Defendant next turned L.D. over and had anal intercourse with her. L.D. told defendant, "stop, stop," but he continued. He eventually withdrew his penis, turned L.D. over, and ejaculated on her stomach. The next morning, defendant told her that he wanted to have sex with her again.

The sexual incidents continued; sometimes defendant had L.D. touch his penis, other times he touched her vagina. Defendant had intercourse with L.D when she went on a camping trip with him in the seventh grade. His family came to the campsite the following day. When defendant's wife told defendant he needed to go home to get a blanket, defendant took L.D. and his four-year-old son A.R. home with him. While A.R. played in the game room, defendant had sex with L.D. L.D. told defendant to stop, but he continued. When she tried to get away, defendant grabbed her shoulders from behind and subdued her.

Another time, defendant entered the small closet bedroom where L.D. was sleeping, woke her up, and told her that he wanted to have sex. L.D. told defendant to stop, tried to push him off, and crossed her legs, but defendant persisted and had intercourse with her. As he pushed on L.D. to keep her from moving, defendant signed, "Oh, this feels so good."

According to L.D., defendant had sex with her at other times and in other locations like the closet, the car, his and his wife's bedroom, and a vacant house. L.D. had anal sex with defendant only two times. Defendant wanted "more and more sex . . . every day" and begged her for it. He would lock the door after entering a room where she was. L.D. would say, "stop it" and sign, "stop it" when defendant touched her. She felt like she could not escape when defendant had intercourse with her.

Defendant once asked her for a "blow job" and L.D. said, "yeah, yeah." She first told him no, but went ahead and did it. She had oral sex with defendant at home and in his car.

3

Defendant tried to give L.D. a new phone after she broke her cell phone when she was 13. He had a "secret" phone number different from his regular phone number for L.D. to text him. He and L.D. smoked marijuana together at some point.

L.D. eventually told her friend that she had smoked marijuana with defendant and his son J.R., and asked the friend not to reveal it so L.D. would not get in trouble. She later told the friend about being sexually abused by defendant. The friend got L.D. to tell a teacher, but L.D. only admitted to smoking marijuana with defendant, as she felt too embarrassed to talk about the sexual abuse. L.D. eventually told a teacher about the abuse after the friend kept trying to persuade her to do so.

Trina Forsberg was a sign language interpreter who worked at L.D.'s school. One day, a teacher speaking with L.D. asked Forsberg to come over. L.D. said, "I don't want sex anymore with Robert." Forsberg then took L.D. to talk to a counselor, to whom she described the various sexual acts defendant committed. It was difficult for L.D. to describe what happened, but she appeared to be relieved after revealing the incidents. L.D. was subsequently interviewed by the police, where she recounted defendant's sexual assaults.

S.D. is L.D.'s mother. Acting as L.D., she sent a series of text messages to defendant's cell phone. In the ensuing exchange of messages, S.D. made several references to a nude photograph L.D. had sent to defendant. S.D. also wrote, "No, no, but need to talk to someone because I don't think it right." Defendant replied, "You just talk to me." S.D.'s response was, "Okay, I don't think it was right. I want to tell my mom. She keep asking me what's wrong with me." Defendant texted back, "You're fine. I'm not mad. You don't want to visit. That's fine. Don't worry. I can bring your stuff back and you can forget us. Can you?" Defendant also sent a message asking if she wanted to hurt his family. Later, S.D. texted to defendant, "I think what you did to me is wrong. I want to tell mom." Defendant responded, "You want me jailed. Kids will have no father."

4

S.D. testified that defendant was a family friend and a father figure to L.D. She allowed L.D. to stay overnight at defendant's house after getting to know defendant and his family over the course of two to three months. During the transition from sixth to seventh grade, L.D. would at times return home in a bad mood after spending the night in defendant's house. When asked what was wrong, she would get angry.

L.D. was allowed to spend two or three consecutive nights at defendant's home. He once tried to give L.D. a new cell phone. Defendant also would try to visit L.D. when S.D. was absent, which upset her.

### Other Evidence

C.B. last saw defendant 20 years before the trial, when she was 12 or 13 and defendant was 19 or 20. She met defendant through her older brother, who was friends with defendant. Defendant started touching her inappropriately about one month after they met. Thereafter, they would arrange for C.B. to sneak out of her mother's home and go to defendant's mother's home to have sexual intercourse. C.B. did this once every two weeks. They also had sex in the car and at C.B.'s home when her parents were gone. Defendant told C.B. to lie if she was ever asked if they had sex. At times she did not want to have sex with defendant, but he kept asking and begging her.

C.B.'s aunt told C.B.'s parents after hearing C.B. tell defendant she might be pregnant. C.B.'s father and brother told defendant to stay away from her; defendant continued to see C.B. and told her they could not stay in the area or they would both go to jail. C.B. then went with defendant to a motel in another city, where they had "continuous" sexual intercourse. When she refused to go to Washington with him, defendant got very angry and told C.B. she would go to jail and never see her mother again. Scared, C.B. accompanied defendant to Washington. Once there, C.B. repeatedly told defendant she wanted to go home. She was eventually reunited with her parents after they learned of her whereabouts. By the end, she was afraid of defendant.

5

Defendant continued to try to see C.B. after she returned home. Even though he was told not to see her, defendant would come over to her home when her parents were gone. C.B. told defendant she no longer wanted to have a relationship with him, which angered him. Defendant tried to renew the sexual relationship, which caused C.B. to report the matter to her father.

Dr. Anthony Urquiza testified as an expert witness on the subject of Child Sexual Abuse Accommodation Syndrome (CSAAS). Dr. Urquiza explained five factors which, according to the CSAAS theory, often occur in child abuse cases: (1) secrecy or seeking to keep the victim silent by means that may include threats, intimidation, or physical abuse; (2) the victim's feeling of helplessness; (3) the victim's feeling of entrapment and attempts to cope by accommodation; (4) delayed or unconvincing disclosure of the abuse; and (5) retraction, especially after the abuser or a proxy has had access to the victim and has made threats or has tried to arouse the victim's feelings of guilt and responsibility for harming the abuser or others in the family. There is often a significant delay between the initial abuse and disclosure. Victims of child sexual abuse often make inconsistent statements due to a lack of understanding of the questions, insufficient development, or confusion arising from multiple instances of abuse.

The Defense

Wendy McCoy was one of L.D.'s sign language interpreters at school. After learning about L.D. smoking marijuana, McCoy asked her if defendant ever sexually abused her; L.D. answered no. L.D. was crying and embarrassed during the conversation.

Defendant's wife, Ariana Ruiz, first met L.D. at her son's school. Before she started spending the night at defendant's home, L.D. would come over and play with their children. L.D. would spend the night about one to two times per year. L.D. and

defendant were never alone together at the Ruiz home.  L.D. went camping with their family twice, both times with his entire family.

Defendant's son B.R. was 14 at the time of the trial.  L.D. spent only one or two nights at their house.  She would watch television and play games when she spent the night there.  L.D. once sent a photograph of her breasts on defendant's phone, which B.R. also used.

Defendant testified on his own behalf.  He first met L.D. when she was 11, when she approached him and asked who he was.  At some point, defendant met S.D. and they arranged for L.D. to visit his home because he had two deaf children.  L.D. visited defendant's home with S.D. before she spent a night there.  She spent the night at his home two or three times a year between 2008 and 2010.  He had no contact with L.D. from fall 2008 to late summer 2009.  The last time L.D. spent the night was in October 2010.  L.D. went camping with defendant and his family twice, but he never camped alone with her.  He never had sex with L.D. and never touched her inappropriately.

Defendant claimed the text messages on his phone were sent by his son J.R. Defendant did not understand the references to a photograph, and believed L.D. may have referred to family photographs he sent to her.  When he got a message indicating L.D. did not feel safe around him, he began to think someone was trying to persuade her to falsely accuse him of something.

Defendant admitted a prior conviction for felony wire fraud in 2003  and was on federal supervised release when he first met L.D.

DISCUSSION

I

*Sufficiency of the Evidence*

Defendant contends there is insufficient evidence to support any of his convictions because the evidence as a whole was not credible, reasonable, or of solid value.

7

"To determine whether the prosecution has introduced sufficient evidence to meet [the reasonable doubt] burden, courts apply the 'substantial evidence' test. Under this standard, the court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] The focus of the substantial evidence test is on the whole record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' [Citation.]" (*People v. Cuevas* (1995) 12 Cal.4th 252, 260-261; italics omitted.)

Defendant's claim is based on an alleged lack of credibility of the complaining witness, L.D. Regarding the incident in the bathroom, defendant notes testimony from L.D. that she did not really know any of defendant's children when she spent the first night at defendant's home. Defendant claims it is not plausible that L.D. "would show up at an adult's house and not know or have met his children." He points out this testimony was contradicted by L.D.'s mother's testimony that they met defendant's family several times before she let her daughter spend the night. He also notes contradictions in L.D.'s testimony about the bathroom incident, such as not remembering if the other children were awake when she got out of the bathtub and then later testifying that they were awake when she got out of the bathtub.

Defendant also finds problems with L.D.'s testimony regarding the camping incident. He finds it incredible that L.D.'s mother "would allow her daughter to go camping alone with anyone, let alone a married man." He likewise finds it incredible that defendant "would travel over an hour-and-a-half, one way, just to retrieve a blanket." Defendant additionally notes that L.D.'s testimony was contradicted by the testimony of defendant's wife. Finally, defendant finds L.D.'s testimony that she had "sex" on other occasions to be insufficiently specific because the prosecution did not ascertain what that term meant to L.D.

8

In a sufficiency of the evidence claim, we will not evaluate the credibility of testimony on appeal.  Assessing the credibility of witnesses remains the exclusive province of the trial judge or jury.  (*People v. Smith* (2005) 37 Cal.4th 733, 739.)  We can reject L.D.'s testimony that defendant repeatedly molested and sexually assaulted her only if it is "physically impossible or inherently improbable."  (*People v. Young* (2005) 34 Cal.4th 1149, 1181 [uncorroborated testimony of a single witness is sufficient to sustain conviction].)  To be inherently improbable, the inaccuracy of the testimony " ' "must be apparent without resorting to inferences or deductions.  [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]" ' " (*People v. Mayberry* (1975) 15 Cal.3d 143, 150.)

Defendant failed to meet this burden.  L.D.'s testimony regarding repeated molestations and sexual assaults by defendant, if accepted, constitutes substantial evidence of his guilt as to all the charged offenses.  A handful of possible contradictions in L.D.'s testimony does not render it physically impossible or inherently improbable. Given L.D.'s detailed testimony relating sexual assaults from defendant, a jury could reasonably infer L.D. knew what the term "sex" meant.  Substantial evidence supports defendant's convictions.

II

*Force, Fear, Duress, or Menace*

Defendant asserts that even if L.D.'s testimony is credible, there is insufficient evidence of force, fear, duress, or menace to support the rape and sodomy counts.

Defendant was convicted on four counts of violating section 269, subdivision (a)(1) and one count of violating section 269, subdivision (c)(3).  Section 269 states in pertinent part:  "(a) Any person who commits any of the following acts upon a child who

9

is under 14 years of age and seven or more years younger than the person is guilty of aggravated sexual assault of a child:  [¶]  (1) Rape, in violation of paragraph (2) or (6) of subdivision (a) of Section 261.  [¶] . . . [¶]  (3) Sodomy, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d), of Section 286.”

For the purposes of section 269, rape is defined as sexual intercourse “accomplished against a person’s will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another” or “[w]here the act is accomplished against the victim’s will by threatening to retaliate in the future against the victim or any other person, and there is a reasonable possibility that the perpetrator will execute the threat.”  (§ 261, subds. (a)(2), (a)(6).)  For a prosecution under section 269, sodomy constitutes “sexual conduct consisting of contact between the penis of one person and the anus of another person” that is “accomplished against the victim’s will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person” or “where the act is accomplished against the victim’s will by threatening to retaliate in the future against the victim or any other person, and there is a reasonable possibility that the perpetrator will execute the threat.”  (§ 286, subds. (a), (c)(2), (c)(3).)

Defendant argues that the evidence shows only that defendant constantly begged L.D. for sex.  He finds this is insufficient evidence of “force, violence, duress or fear of immediate bodily injury” to support the section 269 convictions.

Defendant is wrong as there is substantial evidence of both force and duress.

“The gravamen of the crime of forcible rape is a sexual penetration *accomplished against the victim’s will* by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury.  As reflected in the surveyed case law, in a forcible rape prosecution the jury determines whether the use of force served to overcome the will of the victim to thwart or resist the attack, *not* whether the use of such force physically facilitated sexual penetration or prevented the victim from physically resisting

10

her attacker." (*People v. Griffin* (2004) 33 Cal.4th 1015, 1027.) The applicable question is whether defendant used force sufficient to accomplish intercourse with the victim against her will, not whether the force was sufficient to overcome her physical strength and ability to resist. (*Id.* at p. 1028.)

Defendant was charged with violating section 269 in counts 3 through 7. Counts 3, 4, and 7 were alleged to have occurred in defendant's garage, count 5 was alleged to have occurred in his bedroom, and count 6 in a small bedroom of his home. L.D. testified that she was afraid of defendant as he was an adult and big. During the incident in the garage, L.D. tried to cross her legs and told defendant no as he placed his penis inside her vagina, but defendant persisted and had sexual intercourse with her. When she tried to scream during the assault, defendant put his hand over L.D.'s mouth and told her not to make any noise. Next, defendant turned L.D. over and had anal intercourse with her even after she told him no. A jury could reasonably conclude that defendant used his greater size and strength to overcome L.D.'s attempt to resist the sexual acts he initiated.

L.D. also testified that when she and defendant returned from camping to get the blanket, defendant had intercourse with her even though she told him to stop, and held her by the shoulders, subduing her when she tried to get away. Finally, L.D. testified to another incident when she was sleeping, where defendant awoke her and had intercourse even though she told him to stop, crossed her legs, and tried to push him off. Defendant also kept her from moving during this attack by pushing on her. As with the garage incident, these incidents again show defendant using his greater size and strength to have intercourse with L.D. over her verbal and physical attempts to stop it. This too is sufficient evidence of force to support the section 269 convictions.

There is also sufficient evidence of duress to support the convictions on all counts.

In determining the existence of duress, the totality of the circumstances must be considered. Relevant factors include the age of the victim, her relationship to the defendant, relative size and age disparities, and past and present conduct of the defendant

11

toward the victim, including such things as prior sexual acts, threats, physical restraint, and warnings not to tell. (*People v. Cochran* (2002) 103 Cal.App.4th 8, 13-15, disapproved on other grounds in *People v. Soto* (2011) 51 Cal.4th 229, 248, fn. 12; *People v. Senior* (1992) 3 Cal.App.4th 765, 775; *People v. Superior Court (Kneip)* (1990) 219 Cal.App.3d 235, 238-239; *People v. Sanchez* (1989) 208 Cal.App.3d 721, 748.) "In determining the existence of duress, force or fear, factors such as the position of dominance and authority of the defendant and his continuous exploitations of the victim may be considered. [Citations.]" (*People v. Cardenas* (1994) 21 Cal.App.4th 927, 940.)

Defendant is considerably older than L.D. and like a father figure to her. He exploited her sexually over an extended period of time, and would repeatedly beg her for sex. He would also tell her not to report the sex to anyone else and sought to set up a private means of communicating with her through a secret phone number. Defendant locked the door behind him before the sexual assaults, thus restraining L.D. by preventing her escape. Taken together, these constitute psychological coercion by defendant as he exploited his position of authority, isolated L.D., and wore her down so that she would have sex with him against her will. This is substantial evidence of duress sufficient to support the section 269 convictions.

III

*Uncharged Misconduct*

Defendant's final contention is that it was prejudicial error to admit the prior uncharged misconduct evidence of defendant having sex with C.B. when she was 12 or 13 and he was 19 or 20. He claims the evidence should not have been admitted because the uncharged incidents took place 20 years ago. He additionally notes that he was a different person during the incidents in the present case, a 38-year-old man with four children than the 19 or 20 year old living with his parents during the uncharged prior misconduct.

12

Evidence of prior criminal conduct is generally inadmissible to show that the defendant has a propensity or disposition to commit those acts. (Evid. Code, § 1101, subd. (a).) However, the Legislature created exceptions to the general rule where the uncharged acts involve sexual offenses or domestic violence. (Evid. Code, §§ 1108, 1109.) By its express language, Evidence Code section 1108 requires the court to engage in the weighing process under Evidence Code section 352 before admitting propensity evidence. (Evid. Code, § 1108, subd. (a); *People v. Falsetta* (1999) 21 Cal.4th 903, 917.) In this weighing process, the court must consider factors such as relevance, similarity to the charged offense, the certainty of commission, remoteness, and the likelihood of distracting or inflaming the jury. (*People v. Falsetta*, at p. 917.) We review a challenge to admission of prior bad acts under Evidence Code section 352 for abuse of discretion and will reverse only if the trial court's ruling was " 'arbitrary, whimsical, or capricious as a matter of law. [Citation.]' " (*People v. Branch* (2001) 91 Cal.App.4th 274, 282.)

In *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*), we identified the following factors as relevant to the proper balance of prejudice and probative value in connection with prior uncharged sex offenses: (1) the inflammatory nature of the prior offense evidence; (2) the probability that admission of the evidence will confuse the jury; (3) the remoteness of the prior offense; (4) the consumption of time necessitated by introduction of the evidence; and (5) the probative value of the evidence. (*Id.* at pp. 737-740.)

The prior misconduct evidence was not inflammatory in the context of this case. The incidents related by L.D. started at a younger age, when she was 10 or 11, than those with C.B. which started when she was 12 or 13. Also, L.D.'s testimony described multiple incidents of forcible sexual assault, while C.B.'s prior misconduct testimony did not. Nor was the evidence likely to confuse the jury, as it involved nothing more than C.B.'s testimony as to the prior uncharged incidents. This distinguishes this case from *Harris,* where we found it potentially confusing to the jury that the defendant was

13

charged with rape in the prior misconduct but convicted of burglary; this leading the jury to believe the defendant "escaped appropriate rape charges and was *merely* convicted of burglary, leaving the rape victim unrevenged. [Citation.]" (*Harris, supra,* 60 Cal.App.4th at p. 738.)

In *Harris*, this court held that, in determining whether an incident's remoteness weighs against admissibility, a court must consider whether the defendant led a life in the interim free of relevant sexual misconduct. (60 Cal.App.4th at p. 739.) In *Harris*, the prior act was committed 23 years before the charged acts and the defendant was paroled 17 years before the charged acts occurred. (*Id.* at pp. 731, 739.) We determined that "[a]lthough there is no bright-line rule, 23 years is a long time" and "[t]he remoteness of the evidence weigh[ed] strongly in favor of exclusion." (*Id.* at p. 739.)

Here, there was a difference of 20 years between the commission of the prior misconduct and the charged offenses. There was no evidence to suggest defendant had engaged in relevant sexual misconduct between the prior misconduct and the instant offenses. The remoteness of the prior offense weighed in favor of exclusion.

Regarding the consumption of time, we held in *Harris* that where the challenged evidence occupied only 25 pages of transcript, but required "lengthy instructions and admonitions and occupied a good portion of the closing arguments," this factor could weigh in favor of admission "but not strongly so." (60 Cal.App.4th at p. 739.) Here, the testimony took 14 pages and required some additional instruction. The trial court could find that the length of time weighed in favor of admission.

In determining probative value, we consider "the degree of similarity of the prior and current offenses, as similarity would tend to bolster the probative force of the evidence." (*Harris, supra*, 60 Cal.App.4th at p. 740.) Although the prior and current offenses were not identical, there is considerable similarity. While he was much younger at the time of the prior offenses, defendant targeted girls under the age of 14 in both instances. As in the current case, defendant had a prolonged sexual relationship with his

14

victim. Like the charged offenses, there was evidence that defendant begged C.B. for sex at times. In both cases, the victim eventually became afraid of defendant. The prior uncharged misconduct evidence was therefore sufficiently similar to the charged offenses to be of probative value.

Given the probative value and the lack of any other factors favoring exclusion, the relative remoteness of the prior acts did not mandate excluding the prior misconduct evidence. It was not an abuse of discretion to admit C.B.'s testimony.

DISPOSITION

The judgment is affirmed.


        HULL        , J.


We concur:


      RAYE      , P. J.


      BLEASE     , J.