[No. H030458. Sixth Dist. June 3, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
MARIO ANTONIO BAUTISTA, Defendant and Appellant.

## COUNSEL

Meredith Fahn for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Aileen Bunney, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MIHARA, Acting P. J.**—Following a jury trial, defendant, Mario Antonio Bautista, was convicted of four sex offenses involving two teenage girls (Pen. Code, §§ 289, subd. (i) [sexual penetration of person under the age of 16; count 1], 289, subd. (d)(4) [sexual penetration of person unconscious of the nature of the act; count 2], 289, subd. (h) [sexual penetration of person under the age of 18; count 3], 288, subd. (c)(1) [lewd or lascivious act on child age 14 or 15; count 5]), and of two counts of attempting to dissuade a witness or

victim from reporting a crime (Pen. Code, § 136.1, subd. (b)(1) [counts 6 & 7]).[1] Defendant was acquitted on an additional count of a lewd and lascivious act on a child age 14 or 15 (§ 288, subd. (c)(1); count 4). After denying defendant's motion for a new trial, the trial court sentenced defendant to 11 years four months in state prison and required defendant to register as a sex offender pursuant to section 290.

On appeal, defendant claims his conviction in count 2 for sexual penetration of a person unconscious of the nature of the act must be reversed for lack of substantial evidence. He contends that, because he was an unpaid lay pastor, the jury could not find that he fraudulently represented a "professional purpose" as required by the statute. (See § 289, subd. (d)(4).) We disagree. We conclude there is substantial evidence supporting the jury's finding that defendant purported to have a "professional purpose" for his sexual penetration of the teenage victim when, in fact, the act served no such purpose.

Defendant also argues on appeal that (1) the court erred in excluding evidence regarding the prior sexual conduct of a victim; (2) his First Amendment right to the free exercise of religion was violated by the admission of evidence relating to his religious beliefs; (3) his constitutional rights were violated by the cumulative prejudice of the errors at trial; (4) the sex offender registration requirement, in the absence of a conviction for violation of section 289, subdivision (d)(4), violated his right to equal protection; and (5) the imposition of consecutive sentences violated the Sixth Amendment under *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856] (*Cunningham*). We find no support for defendant's remaining claims of error and affirm the judgment.

## I. Background

From approximately 2001 to 2004, defendant was the pastor and leader of an independent Pentecostal church in San Jose. The church met three times a week for services and was funded by donations from the 40-to-50-person congregation. Defendant, a licensed immigration attorney, was not paid for his role as pastor.

In his sermons, defendant described himself "as a true son of God." Defendant spoke of prophecy and said that God was speaking through him. He preached that if anyone went against him, they would be against God. Among other things, defendant guided the congregation on the appropriate way to raise children in the church. He was very strict about the separation of boys and girls and required a chaperone for coed groups. Dating was frowned

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

upon, and defendant stressed the prevention of teenage pregnancy. The church also emphasized keeping children away from gangs and drugs and it organized social events to keep the younger members of the church out of trouble.

### A.  Counts 2 and 5: Sexual Penetration (Roxana) and Lewd and Lascivious Act (Anna)

On July 24, 2004, defendant led the regular Saturday service for the church. His sermon was about his recent trip to England and his shock at so many women revealing their bellies of "different colors, different shapes, different sizes."

Sixteen-year-old Roxana and her family were at the service. Roxana had been a member of the church for at least three years, and her family had attended for five years. Roxana trusted and respected defendant. At the end of the service, Roxana told defendant, in response to his questioning, that she was upset because she had "done something with a guy." As the congregation was leaving, defendant asked Roxana and two other teenage churchgoers, Anna and Y., to join him at the back of the church.

Roxana entered a back room of the church with defendant, leaving the other two girls outside the room. In the room, defendant put his arms around Roxana just below her waist. The two stood close together with defendant's pelvic region touching Roxana's, and Roxana could feel defendant's penis.

Roxana and defendant resumed their discussion of Roxana's actions with a boy. Roxana told defendant she had touched a boy's penis and that the boy had put his fingers in her vagina. Defendant then put his hand against Roxana's vagina, over her clothes. He asked her if she was still a virgin. She told defendant she had not had sexual relations with the boy and, upon defendant's continued questioning, confirmed that she was "sure" that she had not. Roxana was a "little mad in the inside" and did not want defendant touching her, but did not tell him that. She was crying. Roxana tried to move defendant's hand, but he told her not to be scared. Defendant put his hand under her clothes and his fingers inside her vagina. It hurt a little bit, and Roxana told defendant she did not like it. Defendant said he wanted to determine if she was still a virgin. He then told Roxana she was no longer a virgin, took his fingers out, and hugged her. He told her he would not tell her parents anything about the boy and that they were not "going to tell nobody about anything." Defendant asked Roxana to kiss him on the cheek and then gave her a kiss on the mouth, making her uncomfortable.

After Roxana exited the back room, 14-year-old Y. entered.[2] Anna testified that Roxana was sobbing as she exited the room. Anna, who was Roxana's friend, asked Roxana what was wrong. Roxana told Anna that defendant had touched her " 'down there,' " indicating her vagina, and that he had put his finger inside her.

A few minutes later, Y. exited the room and 15-year-old Anna entered. Like Roxana's family, Anna's family had attended the church three times a week since 2002. Anna trusted defendant; he was important to her family and her parents went to him for guidance. Defendant was sitting down in the room, and Anna stood a couple of feet away from him. Defendant pulled Anna toward him and put his hands on her waist as she stood between his legs. He made small talk and then pulled her shirt up, stating that he wanted to see what kind of belly she had after seeing a lot of bellies in Europe. He then pulled the waistband of her skirt and looked down her skirt. He put his forehead on hers and pulled her close with his hands on her buttocks. She was uncomfortable and hoped he would not touch her as he had Roxana. Defendant placed his hands on Anna's head and, just before ending the conversation, kissed her. At a church event the next day, Anna told Roxana what had happened with defendant.

Around midnight a week later, July 31, 2004, Roxana's mother (D.) found Roxana and a girlfriend on the street in front of the house. D. was angry with Roxana and pushed her back into their house. D. said she was going to tell "Brother Mario because we used to tell [him] everything because they respected him and they feared him."[3] Roxana then told her mother about the July 24 incident. Roxana said that "[defendant] had kissed her on the mouth and that he wanted to know if she was virgin, and he touched her to see if she was a virgin." Roxana also told her mother that defendant "was always hugging her in a morbid way" and described past incidents. Roxana "was bothered and she was crying." Roxana said she had not spoken of this earlier because the family loved defendant so much.

That same morning, July 31, D. called Anna's father (Jose) to tell him about the incident the week before. In response to Jose's resulting query, Anna said that defendant had tried to kiss her on the mouth and grabbed her buttocks. She seemed ashamed and hurt, and she was crying. Anna told her mother that defendant "had touched her" the previous Saturday. Jose called defendant and spoke to defendant's wife about the girls' statements. Defendant got on the phone when he heard that Roxanna's parents planned to call the police. He yelled at Jose and said he was going to kill himself.

---

[2] Y. testified that defendant spoke only of her studies, and that he did not hug her.

[3] D. explained that, prior to July 2004, she respected, trusted, and loved defendant and thought Roxana felt the same way. D. taught her children to do what defendant told them.

Later that day, during the initial part of her interview with the police, Anna denied any touching because her family "had decided it might be wrong to push charges against [defendant]." Likewise, when Jose first spoke to the police, he did not mention the touching as he was afraid to accuse his spiritual leader, "God's person."

## B. Counts 6 and 7: Dissuading a Victim or Witness (D. and Roxana)

After the girls' families spoke on July 31, Roxana's father called the police. Defendant then called Roxana's house. Defendant did not deny the allegations but tried to convince D. to stop her husband from talking to the police; he suggested the family tell the police the allegation was made in anger and was a lie. During the phone call, D. heard people at defendant's house screaming and saying defendant was going to kill himself.

Defendant also spoke to Roxana on the telephone. He asked her if she wanted him to go to jail and wanted to destroy the church and his family. Defendant told Roxana not to tell the police what happened and to say that she made it up because she was mad.

## C. Count 1: Sexual Penetration (Roxana)

July 24 was not Roxana's first incident with defendant. When she was 14 years old, her father dropped her off at defendant's law office for a church outing. Alone in his private office, defendant asked Roxana if she was still a virgin. She told him that she was. When defendant said he was going to check, Roxana allowed it because she wanted him to know that she was a virgin. She did not know exactly what defendant intended to do, but thought that it was appropriate for a pastor to confirm she was a virgin. Defendant then reached his hand up her skirt and put his fingers in her vagina, as he did on July 24. He confirmed she was a virgin and told her to keep it that way. She did not report it at the time because she "didn't think it was anything bad."

Defendant, by hugging Roxana, also made her uncomfortable on other occasions. He would place his hands near her buttocks and hold her so that she could feel his penis.

## D. Count 4: Lewd or Lascivious Act (Anna)

Anna also testified that July 24 was not the first time that defendant had touched her inappropriately. In February or March of 2004, when Anna was 15 years old, she volunteered at defendant's law office. One day, alone in his

office, he pulled her close to him so that her legs were touching his and his hands were around her waist. The way he was holding her made her uncomfortable. Because of defendant's position in the church, Anna did not think at the time that he had bad intentions and thought that she must be "making a big deal about it" in her own mind. On another occasion, at a broadcasting studio, he again pulled her close to him. He asked if she felt dirty, telling her that God had revealed to him that she felt dirty.

The jury found defendant not guilty on this count.

### E. Prior Conduct

Angelina T. met with defendant in 1996 regarding an immigration problem. She was alone with him in his law office and he asked her increasingly personal questions, including about marital problems and her sexual practices with her husband. He told her to come close to him and said she would feel better if she cried. He grabbed her hands and sat her down on his lap with his arms around her waist. He then pulled her close and kissed her. She tried to push his shoulder to get away. She did not see defendant after that evening meeting, but he called her and told her not to tell her husband. He said that, if she told anyone, then he would take her to court and it would be his word against hers. Angelina reported the incident to the police. Defendant told the police that she may have made the accusations for money or to show her husband she could attract other men.

F.C. hired defendant as an immigration attorney in 1998. Defendant was friendlier to her after her husband's arrest and deportation in 1999. At one meeting, defendant grabbed her hands. At another, he walked around the desk and grabbed her shoulders as she was crying. At a third meeting, defendant would not let her companion come into the office with her. He locked the door, grabbed her shoulders, and said he liked her a lot. Defendant pushed her to the floor and wanted her to perform oral sex. Defendant unzipped his pants and pushed her head toward his erect penis, but she cried and told him to let her go. Defendant let her go and F. never returned to the office. She thought that if she reported defendant, he would hurt her immigration case.

Maria S. sought defendant's counsel as an immigration attorney in 2003. He hugged Maria during two of their meetings, making her uncomfortable. On a third occasion, as he hugged her, his penis was hard and he asked her if she could feel the chemistry between them. Maria did not say anything because she had already paid him and she did not think anyone would believe her.

Additionally, a nurse, certified as an expert, testified that one could not verify a girl's virginity by placing one's fingers inside her vagina. An

investigator from the district attorney's office also testified regarding child abuse accommodation syndrome.

## F.  Defense

Defendant testified on his own behalf. He described the formation of the church and his role as pastor. The church began as a Bible study in his house and when the group got too large, he was asked to start a church. The congregation rented a building, and defendant founded the church and incorporated it as a nonprofit organization.

Defendant did not have formal training to be a pastor, but he attended "many seminars and courses and studies." His training amounted to "[h]undreds of hours," and included some Jesuit school training at a university in El Salvador. Defendant did not mention holding any certificate or license to act as a pastor.

As pastor, defendant counseled both children and adults. The church was especially concerned with protecting children from drugs, gangs, and teenage pregnancy. Children in the church would confide in him, and sometimes he would relay the information to their parents for their well-being.

Defendant testified that Roxana approached him to talk on July 24, 2004. In the back room, Roxana cried and described her sexual conduct with a boy. He asked her if she had had sexual intercourse and if she was still a virgin. She said she was a virgin, but he told her that she should tell her mother about her conduct. If she did not, he would talk to her mother. They prayed together, and Roxana left the room. Defendant denied any inappropriate touching.

The same day, defendant spoke with Anna about her home life. Anna told him that Roxana's brother, Daniel, had been sending her e-mails. Earlier in the trial, Anna and her parents had explained that at one time defendant had advised Anna's parents that Anna should be kept away from Daniel. Defendant said that Daniel was a bad influence on Anna. Anna's parents listened to defendant and told Anna she could not see Daniel outside of church. Anna knew that this was defendant's recommendation. Anna's parents also restricted her access to Roxana. Thus, during the conversation on July 24, defendant told Anna she should tell her parents about the e-mails from Daniel. The next day, defendant told Anna's father about the e-mails. Defendant denied any inappropriate touching during his conversation with Anna.

On July 31, 2004, defendant spoke with Roxana and told her to stop her accusations because they were untrue. However, defendant denied ever telling

anyone not to call the police and said he was under the impression the police already had been called at the time he talked to the girls' parents. He denied any physical contact with Angelina, other than a handshake; denied pressing his penis against Maria; and denied touching F. inappropriately.

Defendant's wife said she saw the three girls go to the back of the church with defendant on July 24 and that she saw nothing unusual. The girls were laughing and talking, and Roxana was not crying.

Defendant's wife reiterated that defendant recommended to Anna's parents that Anna and Daniel not be alone together. She explained that defendant told Anna's parents on July 25 that Daniel was e-mailing Anna. Other members of the church corroborated the e-mail discussion. One 15-year-old member of the church, Leonardo P., testified that Anna told him at a church retreat that she hated defendant because he had "squashed" her relationship with Daniel.[4]

Both defendant's wife and a fellow church member, who was at defendant's house on July 31, denied that defendant ever mentioned killing himself. Several employees from defendant's law office, including his wife, testified that Roxana was not wearing a skirt when she was dropped off at defendant's office for a church camping trip in 2002.

A pastor from El Salvador, who had known defendant since 1976, also testified on defendant's behalf. He visited defendant in August 2004 and asked Anna what defendant did to her. Anna said nothing had happened and that she was supporting her friend, Roxana. Anna's mother told the pastor the charges would be dropped.

## II.  Discussion

### A.  Sufficiency of the Evidence Supporting Conviction Under Section 289, Subdivision (d)(4)

In count 2, defendant was convicted pursuant to section 289, subdivision (d)(4) of sexual penetration of a person unconscious of the nature of the act. Defendant contends that the element of unconsciousness cannot be satisfied in this case. He argues specifically that because he was an unlicensed and unpaid pastor, he could not have had a purported "professional purpose"; Roxana could not have believed that he had a "professional purpose"; and Roxana could not have been misled regarding his true intentions.

---

[4] During Anna's testimony, she had denied being angry with defendant and denied ever stating that she hated him.

## 1. Applicability of Section 289, Subdivision (d)(4)

Section 289, subdivision (d)(4) states: "Any person who commits an act of sexual penetration, and the victim is at the time unconscious of the nature of the act and this is known to the person committing the act or causing the act to be committed, shall be punished by imprisonment in the state prison for three, six, or eight years. As used in this subdivision, 'unconscious of the nature of the act' means incapable of resisting because the victim . . . [¶] . . . [¶] (4) Was not aware, knowing, perceiving, or cognizant of the essential characteristics of the act *due to the perpetrator's fraudulent representation that the sexual penetration served a professional purpose when it served no professional purpose.*" (Italics added.)

Subdivision (d)(4) was added to section 289 in 2002, effective January 1, 2003. (Stats. 2002, ch. 302, § 5.) The new subdivision was part of a comprehensive amendment that added the "professional purpose" circumstance to five sex crime statutes. (Stats. 2002, ch. 302, §§ 1–5; see also § 243.4, subd. (c) [sexual battery]; § 261, subd. (a)(4)(D) [rape]; § 286, subd. (f)(4) [sodomy]; § 288a, subd. (f)(4) [oral copulation]; § 289, subd. (d)(4) [sexual penetration].) Prior to the amendment, the law provided that a victim could be unconscious of the nature of the act "due to the perpetrator's fraud in fact." (Stats. 2002, ch. 302, § 5; see also § 289, subd. (d)(3).)[5] Aside from one limited exception, the law did not cover those situations in which the victim was unaware of the essential characteristics of the act due to the perpetrator's fraud in the inducement.[6] The 2002 amendment expanded the meaning of unconsciousness to include a narrow set of circumstances involving fraudulent inducement: those in which the victim was unaware of the nature of the act due to the perpetrator's fraudulent representation that the sexual penetration served a professional purpose. (See Stats. 2002, ch. 302, § 3.) None of the amended statutes define "professional

---

[5] One court explained recently that fraud in fact is "limited to those narrow situations in which the victim consented to the defendant's act but, because the victim believed the essential characteristics of the act consented to were different from the characteristics of the act the defendant actually committed, the victim was incapable of resisting the act actually committed because the victim was ignorant (or 'unconscious') of the true nature of the act permitted." (*People v. Stuedemann* (2007) 156 Cal.App.4th 1, 7 [67 Cal.Rptr.3d 13].) The example commonly used is when the victim consents to a medical examination that includes penetration with an instrument, but the defendant surreptitiously inserts his penis instead of the medical instrument. (*Ibid.*)

[6] The exception is found in section 266c, which states: "Every person who induces any other person to engage in sexual intercourse, sexual penetration, oral copulation, or sodomy *when his or her consent is procured by false or fraudulent representation or pretense that is made with the intent to create fear,* and which does induce fear, and that would cause a reasonable person in like circumstances to act contrary to the person's free will, and does cause the victim to so act, is punishable by imprisonment in a county jail for not more than one year or in the state prison for two, three, or four years." (Italics added.)

purpose," however. (§ 289, subd. (k); see generally § 243.4, subd. (g); see also § 261; § 286; § 288a.) Additionally, no published California decision has addressed the term "professional purpose" as used in section 289 or in any of the parallel sexual assault statutes.

■ To determine whether an unpaid lay pastor may purport to have a professional purpose, we look to the well-settled rules governing statutory construction. "We begin with the fundamental premise that the objective of statutory interpretation is to ascertain and effectuate legislative intent. [Citations.] To determine legislative intent, we turn first, to the words of the statute, giving them their usual and ordinary meaning. [Citation.] When the language of a statute is clear, we need go no further. However, when the language is susceptible of more than one reasonable interpretation, we look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part. [Citations.]" (*People v. Flores* (2003) 30 Cal.4th 1059, 1063 [135 Cal.Rptr.2d 63, 69 P.3d 979].)

The parties disagree regarding the usual and ordinary meaning of "professional purpose." Defendant argues that only those perpetrators with occupations subject to strict licensing and certification requirements can have the requisite "professional purpose." As support, he points to the treatment of professionals in the Corporations Code and to select dictionary definitions that emphasize formal qualification or specialized training as the key attribute of a "professional." (See, e.g., Corp. Code, § 13401, subd. (a) [" 'Professional services' means any type of professional services that may be lawfully rendered only pursuant to a license, certification, or registration authorized by the Business and Professions Code, the Chiropractic Act, or the Osteopathic Act."].)

Although we may look to the statutory scheme as a whole in parsing a particular statute, the statutory definition of a similar term in an unrelated California code carries little weight. "Professional purpose" is unqualified in section 289. The statute does not mandate that the perpetrator be a "professional" or that he or she meet the formal state certification and licensing requirements set forth in the Business and Professions Code or other regulatory statutes. Moreover, for every definition that defendant cites that limits professionals to those granted licenses or certification, the People cite another that includes members of the clergy among the ranks of those that act in a professional manner. (See, e.g., Black's Law Dict. (8th ed. 2004) p. 1246 ["profession. 1. A vocation requiring advanced education and training; esp., one of the three traditional learned professions—law, medicine, and the ministry."].) The Penal Code, for instance, includes members of the clergy as

mandated reporters of child abuse (§ 11165.7, subd. (a)(32)) and refers to the duty of such reporters to act whenever the reporter, "in his or her *professional capacity* or within the scope of his or her employment, has knowledge of or observes a child whom the mandated reporter knows or reasonably suspects has been the victim of child abuse or neglect" (§ 11166, subd. (a), italics added).

■ With this backdrop of varying uses of "professions" and "professionals," and the absence of explicit qualification in the statute, we cannot conclude that the plain meaning of "professional purpose" is limited to the representations of those perpetrators subject to state certification requirements. More specifically, we find no basis on which to exempt members of the clergy from those that may purport to have a "professional purpose." The commonsense meaning of the statutory language would appear to encompass actions taken in the course of one's vocation or based on one's specialized knowledge or training in a given field. Pastors, ministers, and priests have specialized knowledge of their respective religions and perform a wide range of official functions for the members of their congregations. They preach, hear confessions, lead prayer groups, and educate and counsel individuals in religious matters. In performing these functions, a member of the clergy may be acting with a "professional purpose," or represent that he or she has a "professional purpose," as that term is used in section 289.

We believe this broad construction of "professional purpose" is consistent with the legislative intent of the statute. The focus of the statute is clearly the perpetrator's fraudulent representation that is used to take advantage of an unknowing and vulnerable victim. The precise nature of the perpetrator's employment is less important in this context than the appearance of authority and of a legitimate purpose that allows the perpetrator to penetrate the victim without the victim's understanding of the true nature of the act.

■ Defendant's remaining arguments do not alter our analysis. Defendant cites several cases holding that members of the clergy who provide counseling services are not subject to professional malpractice liability. (See *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 299–300 [253 Cal.Rptr. 97, 763 P.2d 948] [finding no professional duty of care for pastoral counselors who provided counseling to church member prior to his suicide]; *Jacqueline R. v. Household of Faith Family Church, Inc.* (2002) 97 Cal.App.4th 198, 207 [118 Cal.Rptr.2d 264] (*Jacqueline R.*) [pastor who engaged in sexual conduct with church member seeking marital counseling is not held to same standard of care as a licensed marriage counselor]; *Richelle L. v. Roman Catholic Archbishop* (2003) 106 Cal.App.4th 257, 270 [130 Cal.Rptr.2d 601] (*Richelle L.*) [priest who engaged in sexual relations with parishioner is not liable for breach of a professional duty to the

parishioner analogous to the duty a physician or psychotherapist owes to a client].) Defendant asserts that, based on this authority, "the element of a professional relationship is unfulfilled, as a matter of law, and the conviction for sexual penetration by fraudulent representation of a professional purpose is illegitimate." This argument is unavailing. A "professional relationship," regardless of whether it is defined by a professional duty of care or some other standard, is not an element of the crime set forth in section 289, subdivision (d)(4). Separate and apart from whether the relationship between pastor and churchgoer is appropriately characterized as professional, fiduciary, or confidential, a churchgoer could understand a pastor's actions to have a professional purpose when, in fact, they do not.

The inapplicability of defendant's authorities is underscored by the fact that the primary concern raised in the cases regarding the extension of a professional standard of care to religious-based services is not relevant in the context of the fraudulent inducement of a sex act. In *Richelle L.*, for example, the court explained that "a standard of care and its breach could not be established without judicial determinations as to the training, skill, and standards applicable to members of the clergy in a wide array of religions holding different beliefs and practices." (*Richelle L., supra*, 106 Cal.App.4th at p. 270.) The court expressed concern that applying uniform standards could restrict the free exercise of religion and "result in the establishment of judicially accepted religions." (*Ibid.*) In applying section 289, subdivision (d)(4) to a member of the clergy, we need not establish a standard of care that prioritizes one set of religious beliefs over another. The jury need only find that the perpetrator fraudulently represented that he or she had a professional purpose.

■ Defendant also argues, in the alternative, that the statute's actual language is ambiguous but that its legislative history reveals that "professional" was intended to refer only to a medical professional. As set forth in various bill analyses, the author of the bill stated the following in support of enactment: "Current law does not allow the victim of a *fraudulent physical examination* performed for sexual gratification or sexual abuse to prosecute for rape because the victim is unable to prove it is fraud in fact, it was done with consent of the *patient,* regardless of whether it was given unconscious of the real purpose. It was merely fraud in the inducement." (See, e.g., Sen. Com. on Public Safety, Analysis of Sen. Bill No. 1421 (2001–2002 Reg. Sess.) Apr. 16, 2002, p. F, italics added.)[7] The intention of the bill's author is not, however, necessarily indicative of the intention of the Legislature as a

---

[7] The author cited a case in which an X-ray technician digitally penetrated two women, but was not convicted under prior law because the women were aware of his actions and allowed him to touch them. (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 1421, *supra*, at pp. F–G.)

whole in passing the bill. (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 30 [34 Cal.Rptr.3d 520].) Under the standard rules of statutory construction, we will not read into the statute a limitation that is not there. (See, e.g., Code Civ. Proc., § 1858 ["[i]n the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted . . ."].) Had the Legislature wished to limit the statute's application to the medical context, it could have done so within the body of the statute. (Cf., e.g., § 243, subd. (f)(5) [" 'Injury' means any physical injury which requires professional medical treatment"].) Moreover, the court does not even consider the legislative history if it has found, as we have here, that the statutory language is susceptible of only one reasonable interpretation. Under any straightforward reading of the statute, the term "professional purpose" is broad enough to encompass the actions of a member of the clergy.

■ Finally, we reject defendant's contention that, even if the ministry is a profession within the meaning of section 289, he personally was not a professional, and could not have had a purported professional purpose, because he was an *unlicensed* and *unpaid* pastor. As noted, the statute does not require that the perpetrator have a specified level of training, licensing, or employment. In addition to the edict that the court not insert conditions not apparent on the face of the statute (see, e.g., Code Civ. Proc., § 1858), we foresee practical problems with imposing such a requirement. It is unclear what credentials would distinguish a "lay" pastor from a "professional" pastor—the distinction defendant attempts to make. The Business and Professions Code, for instance, expressly exempts members of the clergy who perform counseling services as part of their "pastoral or professional duties" from the licensing provisions applicable to marriage and family counselors. (Bus. & Prof. Code, § 4980.01, subd. (b); see also *Jacqueline R., supra*, 97 Cal.App.4th at pp. 205–206.) More generally, statutes routinely define members of the clergy broadly and without reference to any objective standards. For purposes of Evidence Code section 1034, which allows a member of the clergy to invoke a privilege in regard to a "penitential communication," "member of the clergy" is defined only as "a priest, minister, religious practitioner, or similar functionary of a church or of a religious denomination or religious organization."[8] (Evid. Code, § 1030; see also § 11165.7, subd. (a)(32) [using same definition in mandatory reporting context].) There is no mention of training, licensing, or salaried status. (See Evid. Code, § 1030; see also § 11165.7, subd. (a)(32).)

---

[8] In his initial interview with the police, defendant invoked this very privilege in regard to his discussions with Roxana. He told police it was difficult to discuss his conversation with Roxana due to his role as pastor and the confidentiality that entails.

Additionally, defendant's distinction could insulate those in professions with objective licensing requirements who perpetrate a larger fraud; i.e., those who purport to be professionals but lack the requisite certification and then use the guise of a professional purpose to engage in sexual misconduct. (See, e.g., *Boro v. Superior Court* (1985) 163 Cal.App.3d 1224, 1226–1231 [210 Cal.Rptr. 122] [the defendant pretended to be a doctor and told the victim that to cure her fatal disease she must have sexual intercourse with the defendant because he had been injected with a serum; the defendant could not be prosecuted under prior law that prohibited only fraud in fact].) The focus of subdivision (d)(4) of section 289 is the fraudulent representation that misleads the victim, not the status of the perpetrator. A distinction between legitimate professionals and purported professionals would undermine the legislative intent to punish this type of egregious deception.

Likewise, we see no basis in the context of section 289 to make receipt of payment the sine qua non in determining whether the fraudulent representation of a professional purpose was used to take advantage of the victim. The statute does not limit the crime to situations in which the perpetrator is paid to perform a professional service. Such a requirement would unnecessarily limit the statute and allow perpetrators to misrepresent the nature of their actions as long as they do not accept payment. Doctors and lawyers often provide pro bono services, which undoubtedly are "professional." Others, such as physical therapists, may offer an additional service gratis to a regular client. Any of these individuals could take advantage of the situation and the guise of a professional purpose to perform a lewd act. Surely such an action would still fall within the language and intent of section 289, subdivision (d)(4).

In sum, we find no support for defendant's contentions that the statute's use of the term "professional purpose" mandates that the perpetrator be in the medical profession, a certified or licensed professional, or paid for his or her services. As the recognized pastor of an organized church, defendant is a member of the ministry regardless of his precise qualifications. In his actions vis-à-vis a member of the church he founded and led, he could purport to have a "professional purpose." Section 289 requires nothing more.

## 2. Sufficiency of Evidence of "Professional Purpose"

Defendant makes additional, fact-specific objections to his conviction under section 289. He argues that, because he never held himself out to be anything other than an untrained lay pastor, Roxana could not have believed he had a professional reason for his actions. He suggests that she could only have believed that he had a personal purpose in penetrating her vagina. Additionally, defendant contends that, because Roxana testified that she did

not think it was the role of a pastor to determine the state of a churchgoer's virginity, she was not misled regarding the true nature of the act. We find sufficient evidence to support the jury's finding.

"The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643].) Substantial evidence is evidence of " 'ponderable legal significance' " that is " 'reasonable in nature, credible, and of solid value.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738].) "We view the evidence in the light most favorable to the prosecution, and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Griffin* (2004) 33 Cal.4th 1015, 1028 [16 Cal.Rptr.3d 891, 94 P.3d 1089].) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Maury* (2003) 30 Cal.4th 342, 403 [133 Cal.Rptr.2d 561, 68 P.3d 1].)

Defendant's church was an active, registered nonprofit organization that rented a building, collected money from churchgoers on a regular basis, and provided a variety of services. The church performed marriages, offered sermons and Sunday school sessions, organized retreats and seminars, and coordinated evangelistic efforts in the broader community. As numerous witnesses testified, defendant was *the leader* of this church. Defendant was the only pastor and had primary responsibility for the thrice-weekly sermons. He held himself out as the voice of God and spoke of prophecies. Defendant described an extensive religious background, including "many seminars and courses and studies" and "[h]undreds of hours" of training, and he preached regularly on Spanish-language television.

More specifically, defendant took an active role in the lives of the church members and provided counseling to adults and children alike. Defendant policed the conduct of the teenage churchgoers, and parents in the church followed his recommendations regarding their children's upbringing. Defendant discussed teenage sexual activity and provided spiritual guidance regarding transgressions. Roxana had attended the church for three years and trusted defendant. He had counseled her at the request of her family. On July 24, she sought defendant's guidance regarding prohibited sexual activity after a service that he led as pastor. She confessed her sexual transgression, and they prayed together.

Regardless of defendant's employment status and lack of "official" credentials, the evidence supports a finding that Roxana spoke to defendant on July 24 in his capacity as the pastor of the church. In this context, the jury could conclude that defendant's actions to verify her virginity had the sheen of a "professional purpose." As defendant acknowledges, the statute is intended to punish those who "invoke professional status for sexual gain"—defendant's conduct fits squarely within this characterization.

Defendant's additional objections to the sufficiency of the evidence relate to Roxana's subjective understanding of the proper role of a pastor and of defendant's true intentions. Her direct testimony on this topic was as follows: "Q. Now, when he put his finger inside you, did you think it was okay? [¶] A. Yes, and at the same time no because I didn't like it. [¶] Q. Okay. And why did you think it was okay? [¶] A. Because he was just—he just wanted to check if I was a virgin or not. [¶] Q. And is that something you thought a pastor—it was okay for a pastor to do? [¶] A. No, but I don't know. For some reason, I thought it was okay for him to do. [¶] Q. And why was it okay for him to do that? [¶] A. Because I thought he cared about me and he wanted to know. [¶] Q. And why was it okay for him to want to know? [¶] A. Because he cared about me. [¶] Q. And was that in relation to who he was in the church? [¶] A. Yes." Roxana further testified that when defendant kissed her after he had removed his fingers, it made her feel differently about his touching her and she no longer thought his only motivation was to check her virginity. Roxana was then asked whether checking her virginity was something defendant was "supposed to do as a pastor?" She answered, "No."

Defendant seizes upon this final answer to argue that it is uncontested that Roxana knew it was not appropriate for a pastor to confirm a female churchgoer's sexual activity by placing his fingers in her vagina. Defendant contends, in fact, that the touching was "never perceived by Roxana to be part of his duties as pastor."[9]

---

[9] In this respect, defendant contends the case is distinguishable from the People's authority, *People v. Cardenas* (1994) 21 Cal.App.4th 927 [26 Cal.Rptr.2d 567] (*Cardenas*). The defendant in *Cardenas* was a self-proclaimed faith healer or curandero. (*Id.* at p. 929.) In the course of providing extended "treatment" to three female believers of the Curanderismo religion, defendant engaged in several acts of sexual penetration. (*Id.* at pp. 929, 931–936.) *Cardenas* involved sexual penetration " 'against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person,' " not penetration based on a misleading purpose or other form of fraudulent inducement. (*Id.* at pp. 930, 932, fn 5.) On appeal, the court found substantial evidence of the element of force or duress to support the defendant's convictions under section 289, former *subdivision (a)* and section 288, subdivision (b). (21 Cal.App.4th at p. 931.) The *Cardenas* court's findings are irrelevant to our determination of the sufficiency of the evidence in the case before us. The element challenged in *Cardenas* is not at issue in this case and *Cardenas* did not involve section 289, subdivision (d)(4) or any of the other sections that reference a professional purpose.

Defendant's restatement of the evidence is an oversimplification of Roxana's testimony. Roxana also explained that she thought defendant touched her only to check her virginity and that she thought it was appropriate due to his role in the church community. She stated clearly that it was not until he kissed her on the mouth, after removing his fingers from her vagina, that she questioned his intentions. In describing the prior incident in defendant's office, Roxana unambiguously explained that she thought it appropriate for a pastor to confirm her virginity. In addition, Roxana's testimony must be viewed in the context of the entire trial. As noted, the jury heard repeatedly that a primary purpose of the church was to protect the chastity of its teenage participants and that defendant was actively involved in ensuring appropriate conduct. Defendant was the ultimate religious authority for the church community and counseled churchgoers regarding their transgressions. At the time of the sexual penetration, Roxana was consulting with defendant in his capacity as pastor of the church. A jury thus could conclude that Roxana was misled regarding the purpose of defendant's actions and believed that he had a legitimate professional reason for confirming her virginity.

Finally, defendant contends that Roxana could not have been unaware of the lewdness of the act on July 24 because she testified that he had made her uncomfortable on previous occasions. Roxana's acknowledgement of prior uncomfortable encounters is not inherently contradictory to a lack of comprehension regarding defendant's true purpose on July 24; it is merely another fact for the jury to weigh in its deliberation. The jury, in finding defendant guilty on count 2, concluded that 16-year-old Roxana believed on July 24 that her pastor was acting for a legitimate reason. As the jury's finding has ample support in the record, it is not the province of this court to question it. We reject defendant's challenge to the sufficiency of the evidence supporting his conviction for violation of section 289, subdivision (d)(4).[10]

## B.  Evidence of Sexual Conduct

Defendant contends that the trial court erred, allowing for a violation of defendant's due process and confrontation clause rights, in excluding evidence regarding Anna's prior sexual conduct. We find no error.

A defendant generally cannot question a sexual assault victim about his or her prior sexual activity. (*People v. Woodward* (2004) 116 Cal.App.4th 821, 831 [10 Cal.Rptr.3d 779].) However, a limited exception is applicable if the victim's prior sexual history is relevant to the victim's credibility. (Evid.

---

[10] Because we uphold defendant's conviction under count 2, we do not reach defendant's separate argument that, absent the section 289, subdivision (d)(4) conviction, the sex offender registration requirement violated his right to equal protection.

Code, § 1103, subd. (c)(4); *People v. Chandler* (1997) 56 Cal.App.4th 703, 707 [65 Cal.Rptr.2d 687] *(Chandler)*.) In prosecutions brought pursuant to section 288, Evidence Code section 782 provides for a strict procedure that includes a hearing outside of the presence of the jury prior to the admission of evidence of the complaining witness's sexual conduct. *(Chandler*, at p. 708; *People v. Daggett* (1990) 225 Cal.App.3d 751, 757 [275 Cal.Rptr. 287] *(Daggett)*.) Evidence Code section 782 is designed to protect victims of molestation from "embarrassing personal disclosures" unless the defense is able to show in advance that the victim's sexual conduct is relevant to the victim's credibility. *(People v. Harlan* (1990) 222 Cal.App.3d 439, 447 [271 Cal.Rptr. 653].) If, after review, "the court finds the evidence relevant and not inadmissible pursuant to Evidence Code section 352, it may make an order stating what evidence may be introduced and the nature of the questions permitted." *(Daggett*, at p. 757.) "A trial court's ruling on the admissibility of prior sexual conduct will be overturned on appeal only if appellant can show an abuse of discretion." *(Chandler*, at p. 711.)

In this case, defense counsel presented testimony, outside the presence of the jury, about a meeting in February 2004 in which defendant talked to Anna's parents about Anna's relationship with Daniel. Anna's parents were told that Anna and Daniel had had sexual relations and that they should take Anna to the doctor to make sure she did not have a venereal disease. Defendant's statements were prompted by an incident the night before. Anna and several other teenagers had spent the night together, and witnesses saw Anna and Daniel kissing under a blanket. Anna admitted that she had given Daniel hickeys that night and that they spent a portion of the evening together under the blanket, but denied sexual intercourse. Based on this incident, defendant advised Anna's parents that Anna and Daniel, and even Anna and Roxana, be kept apart. Anna's parents followed defendant's advice.

Defense counsel argued that the admission of Anna's and Daniel's actions that evening was the only way for the jury to evaluate whether the conduct involved was serious enough to cause Anna to falsely accuse defendant.[11] The trial court rejected this argument. It ruled that defense counsel could cross-examine Anna regarding the incident in which she was told, at defendant's direction, that she must end her relationships with Daniel and Roxana. However, the court excluded "any questions that go into whether there was a hickey or under the blanket or anything like that." The trial court found that, although Anna's alleged hatred of defendant and defendant's interference in her relationships were relevant facts, the "sexual aspect" of the incident was not "probative at all."

---

[11] Prior to the trial court's ruling, defense counsel conceded that the issue of a venereal disease had little relevance in the case: "I see that as a side issue not a part of the motive."

We agree with the trial court. Contrary to defendant's claim that absent the sexual conduct he was unable to elicit "the source of Anna's resentment" toward defendant, he had ample opportunity to explain Anna's motive and bias. During the trial, several witnesses testified regarding defendant's interference in Anna's relationship with Daniel and her friendship with Roxana. The jury heard more than once that Anna knew defendant had advised her parents to keep her away from Daniel and Roxana, and Leonardo testified that Anna hated defendant because of this interference. It is the repercussions of the sexual conduct with Daniel, and not the conduct itself, which ultimately are relevant to understanding Anna's alleged bias against defendant.

Defense counsel nevertheless contends introduction of the sexual conduct was necessary to show the "tone and flavor of Anna's hatred." From the testimony that was introduced, it is clear that defendant intervened because the teenagers' relationship was, in his view, inappropriate. We do not find, as defendant maintains, that, absent knowledge of the sexual conduct, the jury could only conclude that defendant interfered with the relationship to manipulate Anna. The details of the relationship between Daniel and Anna are at best tangentially related to Anna's feelings toward defendant and to any bias or motive to lie.

We also disagree with defendant's summary assertion that the absence of sexual details prevented defense counsel from cross-examining Anna regarding her statement to Leonardo. Anna was asked if she ever made such a statement, and she said no. We fail to see how the introduction of Anna's sexual conduct with Daniel on a separate occasion relates to cross-examination on this issue.

■ Likewise, we find no violation of defendant's right to due process of law or of the confrontation clause. "Although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right." (*People v. Cunningham* (2001) 25 Cal.4th 926, 999 [108 Cal.Rptr.2d 291, 25 P.3d 519].) ■ "A trial court's limitation on cross-examination pertaining to the credibility of a witness does not violate the confrontation clause unless a reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted. [Citations.]" (*People v. Quartermain* (1997) 16 Cal.4th 600, 623–624 [66 Cal.Rptr.2d 609, 941 P.2d 788] (*Quartermain*).) Although Anna's credibility was a central issue in this case, we find that examination of Anna on this particular topic would not have had a significant impact on defendant's defense or on the jury's impression of Anna's credibility. The trial court did not err in excluding testimony related to Anna's sexual conduct with Daniel.

## C. Defendant's Religious Beliefs

Prior to trial, defense counsel moved in limine to preclude questioning regarding the religious beliefs or practices of defendant or any witness. The trial court stated that it would not permit the prosecutor to criticize or denigrate the beliefs of defendant or any witness. The court found, however, that, due to defendant's position in the church, the presence of strict doctrine regarding the behavior of young churchgoers, the nature of the charges, and the behavior of the victims, some discussion of religious beliefs would be appropriate. As set forth in the recitation of facts, the background of the church and the religious tenets of its members were discussed at various points during the trial. Defendant claims that the admission of this testimony regarding his religious beliefs deprived him of his First Amendment rights to the free exercise of religion and violated Evidence Code section 789. We find no violation.

"[T]he Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations . . . simply because those beliefs and associations are protected by the First Amendment." (*Dawson v. Delaware* (1992) 503 U.S. 159, 165 [117 L.Ed.2d 309, 112 S.Ct. 1093] (*Dawson*).) If the evidence is relevant to the issues being tried, its use does not violate the First Amendment. (*Quartermain, supra*, 16 Cal.4th 600, 629, citing *Dawson*, at p. 165.) In *Quartermain,* for instance, our high court found that the defendant's use of racial epithets to describe the murder victim, although protected speech, was admissible because it was evidence of the defendant's attitude toward the victim and was relevant to the defendant's motive. (See *ibid.*; cf. *People v. Morris* (1991) 53 Cal.3d 152, 210, fn. 10 [279 Cal.Rptr. 720, 807 P.2d 949], disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588] [finding admission of witness's devil worship in error, although harmless, because "[d]evil worship was not shown to have any bearing on the witness's credibility or the issues in th[e] case"].)

The tenets of defendant's church, including defendant's religious authority and the congregation's concern with the appropriate behavior of teenage churchgoers, provided an important context for the July 24 incidents. The testimony regarding the churchgoers' beliefs was relevant to understanding the meetings with defendant, defendant's actions, the girls' initial acceptance of defendant's behavior, and the families' subsequent reactions. We therefore find that the introduction of these religious beliefs did not violate the First Amendment.

We likewise find no violation of Evidence Code section 789, which provides: "Evidence of his religious belief or lack thereof is inadmissible to

attack or support the credibility of a witness." Testimony regarding the church's beliefs and defendant's role in the church was not admitted for the purpose of attacking defendant's credibility or that of any witness on the basis of his or her religious beliefs. As explained, the religious background provided a context for defendant's actions and the girls' delayed reporting of the incidents. The church's teachings thus were relevant to determining whether defendant committed the alleged crimes, and admission of this evidence did not violate Evidence Code section 789. (See *People v. Cooks* (1983) 141 Cal.App.3d 224, 326 [190 Cal.Rptr. 211] [a binder containing teachings related to the Nation of Islam was not used to attack the defendant's credibility but to show motive for alleged murder; thus, the binder was admissible evidence regarding the defendant's commission of the alleged crimes].)

### D. Cumulative Prejudice

Defendant contends the cumulative effect of the errors in his trial requires that we reverse the judgment. "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844 [72 Cal.Rptr.2d 656, 952 P.2d 673].) In light of our findings above, we find no prejudicial impact in this case.

### E. Consecutive Sentences

Defendant's final contention is that the imposition of consecutive terms violated his Sixth Amendment right to a jury trial under *Cunningham, supra,* 549 U.S. 270 and *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531] (*Blakely*). As defendant concedes in his reply brief, a recent California Supreme Court decision rejects this argument. (*People v. Black* (2007) 41 Cal.4th 799 [62 Cal.Rptr.3d 569, 161 P.3d 1130] (*Black II*).) In the post-*Cunningham* case, the California Supreme Court reiterated its understanding that *Blakely* and its progeny do not apply " 'to a trial court's decision whether to require that sentences on two or more offenses be served consecutively or concurrently.' " (*Black II,* at p. 821.) Our high court explained: "The determination whether two or more sentences should be served in this manner is a 'sentencing decision[] made by the judge after the jury has made the factual findings necessary to subject the defendant to the statutory maximum sentence on each offense' and does not 'implicate[] the defendant's right to a jury trial on facts that are the functional equivalent of elements of an offense.' " (*Id.* at p. 823.) We are bound by the decision in *Black II* (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 457 [20 Cal.Rptr. 321, 369 P.2d 937]), and therefore reject defendant's *Cunningham* claim.

### III.   Disposition

The judgment is affirmed.

McAdams, J., and Duffy, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 17, 2008, S165133.