Filed 11/15/13  P. v. Flynn CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>RICKY MARSHALL FLYNN,<br><br>    Defendant and Appellant. | F062483<br><br>(Super. Ct. No. BF130203A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Michael E. Dellostritto, Judge.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Jennevee H. DeGuzman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted appellant Ricky Marshall Flynn of forcible sodomy, lewd or lascivious acts with a minor, and assault with intent to commit oral copulation by force. He contends his convictions should be reversed because the trial court (1) erred in excluding prior statements made by the victim regarding sexual activity, which were offered to challenge the victim's credibility and as an explanation for the physical state of the victim, (2) erred in excluding evidence of the victim's reputation for defiance and violence, (3) had a sua sponte duty to instruct the jury on the lesser included offense of nonforcible sodomy, (4) erred in refusing a special instruction that addressed Flynn's police interview and its admissibility, and (5) abused its discretion when it denied a motion for a mistrial.

Flynn also asks this court to correct the abstract of judgment, which fails to state the breakdown of the aggregate amount of fees imposed at sentencing, and to review the school records of the victim to determine if the trial court released all documents referencing dishonesty, sexual activity, violent activity, illicit drug use, lack of sobriety, or other misbehavior.

We conclude the trial court erred prejudicially in excluding the victim's prior statements about sexual activity. Consequently, we will reverse the convictions for forcible sodomy and assault with intent to commit oral copulation by force. We have reviewed the school records of the victim and conclude that all appropriate records were released to the defense. The other issues raised by Flynn are moot because of our reversal of two of the convictions.

**FACTUAL AND PROCEDURAL SUMMARY**

A.A. was born in February 1995. In November 2009 A.A. was 14 years old and was living with Aaron, who was not related to her biologically. Aaron had raised A.A. and she viewed him as a father. A.A.'s mother (mother) lived with A.A.'s grandmother (grandmother). Also living with grandmother were mother's infant daughter, A.A.'s aunt

2.

and her two sons, who were eight and 10 in November 2009, and Flynn and his son, who was about 12 at the time.

Around 5:00 p.m. on the night of November 24, 2009, A.A. was dropped off at her grandmother's house. She had planned to spend Thanksgiving with her family and spend a few nights at her grandmother's house. A.A.'s mother and Flynn arrived around 7:00 p.m. Later that evening, A.A. was in the garage with her mother, grandmother, Flynn, and the other children. After grandmother and the other children left to go to bed, mother began drinking beer. Flynn was drinking hard liquor, and A.A. was drinking some beer.

Eventually, mother took her infant daughter and left to go to sleep in the living room, which left Flynn and A.A. alone in the garage. Flynn and A.A. talked about various things, including Flynn's desire to obtain custody of two of his other children and an upcoming birthday party for his daughter. A.A. drank some of the hard liquor Flynn was drinking. She was not sure if she was intoxicated but admitted at trial that she had more to drink than she initially told police.

At some point, Flynn told A.A. he wanted to show her something. The testimony about Flynn's subsequent actions with A.A. came solely from A.A. She testified he picked her up and carried her from the garage, through the house, and into his bedroom. When they got to Flynn's bedroom, he showed her the bottles of alcohol in his closet. Flynn then pushed A.A. onto his bunk bed; she hit her head as she fell back onto the bed.

With one hand, Flynn held both of A.A.'s hands; with his other hand, he removed her shorts and underpants and his own clothes. Flynn placed his fingers in her vagina and his thumb in her anus. He then placed his penis in her vagina and had intercourse with her for about 20 minutes. Flynn ejaculated and A.A. felt semen running down her legs. Immediately thereafter Flynn penetrated her anus with his penis. This made A.A. jump up and move because it hurt. Following that Flynn wanted A.A. to suck his penis and

3.

tried to place his penis in her mouth, but she kept her mouth closed. In addition to these acts, Flynn squeezed A.A.'s breasts and kissed her on the lips.

Throughout, A.A. asked Flynn to stop. She did not try to fight back. She did not try to scream because Flynn told her not to "or else." She claimed she kicked the wall that separated Flynn's bedroom from her grandmother's bedroom about 10 to 20 times hoping it would wake her or A.A.'s two cousins. None of them woke up.

Flynn eventually stopped the assault and told A.A. not to say anything about it. A.A. told Flynn she was going to the living room to lie down, but instead went to the bathroom and washed her vaginal area. She then got dressed.

When A.A. walked into the living room, she was crying and it woke her mother; mother then asked A.A. why she was crying. A.A. told her it was because she missed her friend, R.P. A.A. claimed she lied to her mother because she saw Flynn in the kitchen. A.A. then used the cordless telephone to call Aaron and apologize for an argument the two had had the day before. She did not tell Aaron about the assault.

A.A. then went to the empty master bedroom, opened a window, and took down the screen. When Flynn saw her, he asked what she was doing. She stated she just wanted some air. Flynn reminded her not to tell anyone about the incident because it would put him "in prison for seven years behind bars."

A.A. then took the cordless telephone into the garage. She tried calling her friend R.P. but was unable to reach her. She called another friend who got R.P. on the line. R.P. asked what was wrong; A.A. told her that Flynn had raped her. R.P. gave A.A. the number of a taxi service so she could call for a ride and leave her grandmother's house. A.A. went into her grandmother's bedroom and took money from her purse to pay for the taxi, called the taxi, and then went outside to wait.

R.P. testified that when A.A. called, she (A.A.) was crying. When R.P. asked what had happened, A.A. said Flynn had touched her. When A.A. went outside to wait for the taxi, she called R.P. and R.P. stayed on the phone until the taxi arrived.

4.

When the taxi arrived, A.A. directed the driver to R.P.'s house. The driver noticed A.A. was crying and asked what was wrong. She said she had been raped by her uncle. The driver allowed her to use his cell phone and she called Aaron's mother and told her what Flynn had done. The taxi driver then pulled into a parking lot and called the police.

The taxi driver was Charles Turner. When he pulled up to grandmother's house, A.A. quickly jumped into the cab. She was crying and seemed "hysterical." Turner asked what was wrong; A.A. said she just needed to leave. Turner drove off but then pulled into a parking lot and refused to drive further until A.A. told him what was wrong. She told him a relative had raped her. Turner remembered hearing A.A. complain of pain.

Police Officers John Rodrigues and Jared Ashby arrived and arranged for an ambulance to take A.A. to the hospital. Aaron's mother arrived and accompanied A.A. in the ambulance.

Daniel Goguen and Felipe Hernandez were the paramedics who took A.A. to the hospital. Goguen thought A.A. appeared hysterical; he noticed a smell of alcohol on her breath. Goguen and Hernandez helped A.A. onto the gurney because she appeared unsteady on her feet. Once on the gurney, A.A. complained of vaginal and lower stomach pain.

Officer Timothy Diaz went to grandmother's house to meet with Flynn. Flynn appeared sober and no more nervous than anyone else being interviewed by the police. Diaz informed Flynn that A.A. claimed she had been sexually assaulted by him (Flynn). Flynn responded by stating he had seen her leave the house in a taxi.

Once they arrived at the hospital, Goguen collected the disposable linens and blankets from the gurney. He had A.A. wipe her vaginal area with gauze. He and Hernandez placed all these items into a bag provided by the police and gave the bag to Rodrigues and Ashby.

5.

Before A.A. left in the ambulance, Rodrigues and Ashby also collected from A.A. the clothing she had been wearing at the time of the assault; she was carrying it with her in the taxi. They booked the clothing and bag of linens into the property room as evidence.

At the hospital, A.A. underwent a sexual assault exam, often referred to as a SANE exam. Nurse Karen Baughman performed the exam. Baughman first obtained a history of the incident from A.A. A.A. admitted to having had some beer and complained of pain to her vaginal and rectal areas. Baughman first testified that A.A. told her she had showered after the incident; later, Baughman testified A.A. denied showering.

Baughman asked A.A. various questions about the incident. A.A. said Flynn did not hit her, punch her, choke her, or threaten her with any kind of weapon. She stated Flynn held her arms over her head while she was lying on the bed. She said Flynn did not threaten any of her family members, but he did tell her not to scream. Flynn did not force her to drink any alcohol or to take any drugs.

Baughman next conducted a physical exam of A.A.; she observed redness around the vaginal and anal areas and found two scratches on the labia minora. In Baughman's opinion, this was consistent with vaginal and anal penetration, although the redness to the anus could have been caused by something other than penetration of a penis. Baughman, however, acknowledged that the physical evidence was consistent with either consensual or nonconsensual sexual activity. There were no red marks or bruises on A.A.'s wrists or arms.

Baughman also found a hair in A.A.'s cervix and unusual white secretions in her vagina. Baughman swabbed A.A.'s mouth, vagina, and anus, collected a sample of what she suspected was semen from A.A.'s leg, and took a blood sample to test A.A.'s alcohol level. Baughman turned these items over to Officer Kejan Gavin, who booked them into evidence. Following the exam, Baughman gave A.A. a shot for sexually transmitted

6.

diseases, an antibiotic, and contraception pills; no pain medication was given or prescribed.

Nurse Mercedes Shriver examined Flynn. She swabbed his penis, scrotum, and mouth, and collected pubic hair samples and nail clippings from him. Shriver turned over the samples to the police and they were booked into evidence.

Carol Williams, a biological fluids analyst, analyzed the samples collected from A.A. and Flynn. Williams found nothing of note on A.A.'s rectal swabs. There was no semen or sperm on A.A.'s lip and mouth swabs. On A.A.'s vaginal swabs, she found semen, but no sperm. There also were white blood cells found on the vaginal swab, indicating a long-term infection.

Williams testified that a normal male has a "very good chance" of having sperm on his penis. Sperm may be present from night emissions, preejaculate, or left over and draining from the last ejaculate. On Flynn's penile swabs, she found semen and epithelial cells. Epithelial cells are found everywhere on a person's body and are not "much value." No semen or sperm was found on Flynn's bedding or A.A.'s clothing.

Tammi Noe, a DNA analyst, analyzed A.A.'s and Flynn's swabs. On the gauze wipe from A.A.'s leg, Noe found the DNA was predominantly A.A.'s; a minor portion of DNA found on the gauze was a partial profile and inconclusive, but Flynn fit within the partial profile. The penile swab contained sperm from Flynn; there was no mixed DNA in the portion of the swab that had sperm. There was a mixture of epithelial cells from two people on the other portion of the penile swab -- one was Flynn and the other had a "high probability" of A.A. being a "contributor." On A.A.'s vaginal swab, two DNA profiles were found -- one belonging to A.A. and one to an unidentified contributor.

Flynn was charged with (1) rape, a violation of Penal Code section 261, subdivision (a)(2) (count 1), (2) forcible acts of sexual penetration, a violation of former Penal Code section 289, subdivision (a)(1) (count 2), (3) forcible sodomy, a violation of former Penal Code section 286, subdivision (c)(2) (count 3), (4) lewd or lascivious acts

7.

with a minor, a violation of Penal Code section 288, subdivision (c)(1) (count 4), and (5) assault with intent to commit oral copulation by force, a violation of former Penal Code sections 220, subdivision (a) and 288a, subdivision (c)(2) (count 5).

### Evidence Code Section 782[1] *Hearing*

Prior to trial, Flynn filed a series of motions seeking to admit evidence to attack A.A.'s credibility and her claim that he forcibly and sexually assaulted her and to provide an alternative explanation for her physical state. Specifically, he filed motions to admit sexual conduct evidence of the complaining witness and evidence demonstrating A.A.'s dishonesty. Flynn also argued in his motions that denying his motions would constitute prejudicial error of constitutional magnitude. The prosecution filed counter motions to exclude all the evidence Flynn sought to admit.

Among the evidence Flynn sought to use to attack A.A.'s credibility were prior false statements made by A.A. that she had been raped by a boy named Patrick, her own father, and by Flynn in the past. Flynn also sought to attack A.A.'s credibility with prior statements made by A.A. that she had engaged in sex with several different boys, had become pregnant twice and had had abortions in September or October 2009, and had posted multiple entries on her MySpace page about having engaged in sexual activity. Flynn provided multiple MySpace and social media postings from A.A. claiming to have engaged in multiple sex acts.

This information was sought to be introduced to attack A.A.'s credibility because she had told officers she was a virgin until Flynn assaulted her the night of November 24, 2009; yet, she made numerous statements about having engaged in sexual activity prior to the incident.

---

[1]All further statutory references are to the Evidence Code unless otherwise specified.

8.

Flynn maintained the statements of prior sexual conduct went to A.A.'s credibility and were outside the scope of a section 782 hearing. Specifically, Flynn argued three theories for admissibility of A.A.'s statements about sexual activity. First, to the extent A.A. did engage in sexual activity with others, the statements attacked her credibility because she was maintaining to police that she was a virgin and had not engaged in any sexual activity until attacked by Flynn. Second, to the extent A.A.'s statements about engaging in prior sexual activity were false, they cast doubt on her credibility in that they demonstrated a pattern of lying about sexual activity. Third, evidence that A.A. had engaged in sexual activity with another shortly before the incident with Flynn was admissible as a possible source of the redness and scratches on her.

Flynn contended section 782 was inapplicable because he did not want to admit evidence of prior sexual activity in order to attempt to show that A.A. consented to the incident with him. To the extent A.A. falsely accused people of raping her, the evidence would discredit her testimony by showing her willingness to accuse people falsely of sexual activity with her. To the extent her statements about engaging in sexual activity with various people were true, the evidence would discredit her testimony of being a virgin and offer an explanation for the redness and scratches on her.

Flynn also sought to admit evidence of instances of other dishonesty by A.A., her history of consuming alcohol, and her reputation for defiance. Again, Flynn argued this evidence would attack A.A.'s credibility.

The trial court held an evidentiary hearing during which A.A. testified. She reiterated that she had been a virgin until the incident with Flynn, denied ever stating to anyone she had been raped or had engaged in sex, and denied posting information about engaging in sex or having been raped on her MySpace page.

Flynn presented evidence from three witnesses, all of whom had heard A.A.'s multiple claims of having been raped by several different men. The witnesses also could have testified to the multiple postings they had seen on A.A.'s MySpace page where she

9.

bragged about engaging in sex and to the multiple statements that had been made to them by A.A. about different partners with whom she claimed to have engaged in sex. One witness could have testified to overhearing A.A. "screaming" at one young man on the phone, yelling "I just gave you my virginity and you don't want to be with me." A.A. was crying and screaming during this telephone call.

The trial court denied Flynn's motion in large part. The trial court denied the request to present any evidence that A.A. had engaged in any prior sexual encounters or any evidence of the multiple statements made by her about having engaged in sexual activity on the grounds that any evidence of A.A. "engaging in any sort of sexual activity … would be improper under the law." The trial court denied the defense's request to admit into evidence multiple pages from A.A.'s MySpace page. The trial court denied the request to present character evidence of a nonsexual nature. The request to present evidence of the multiple false accusations of rape made by A.A. also was denied, except as to one such claim not involving Flynn. The trial court also denied the motions pursuant to section 352, finding that the presentation of the proffered evidence would result in the undue consumption of time.

### *Trial*

The trial began on February 24, 2011. During the trial, the defense renewed its request to admit all the evidence it had sought to admit in the pretrial motions, and the trial court again denied the request. Flynn sought to impeach A.A.'s credibility in numerous ways. The trial court allowed testimony that A.A. had gone to a store with friends to shoplift a bottle of alcohol. A.A.'s grandmother testified that she was a light sleeper, the acoustics in the house were such that noises would echo throughout the house, she did not hear any noises during the time A.A. stated she was being assaulted by Flynn, and A.A. had been known to lie.

On March 10, 2011, the defense moved for a mistrial based upon references by the prosecution in its opening statement to Flynn's pretrial statement, which the prosecution did not attempt to introduce into evidence. The motion was denied.

When the trial court addressed the jury instructions to be given, defense counsel was asked, concerning the forcible sodomy charge, if the only lesser included offense instructions being requested were attempted sodomy and simple battery. Defense counsel responded, "Yes." The trial court then followed up this inquiry with "All right. And any other lesser included offenses that might apply should the evidence have supported them, you're waiving; is that correct?" Defense counsel responded, "I waived it, yes." Later, after closing arguments, defense counsel stated, "we're not waiving any objections to instructions."

After the jury retired to deliberate, it sent a series of notes and questions to the trial court before returning a verdict. On March 15, 2011, the jury sent a note asking to review the testimony of A.A.'s aunt and A.A.'s friend, R.P. The trial court responded it would be available first thing the next morning. On March 16 the jury asked to adjourn for the day for a "cooling off period from heated discussion." On March 17, the jury sent a note asking that the "attourney's argue 'consent.'" (*Sic.*) On March 18 the jury sent a note stating it wanted the attorneys "to focus on the evidence that supports consent or evidence that supports the lack of consent." On March 22, 2011, after approximately six days of deliberations, the jury sent a note stating it had reached a verdict on counts 3, 4, and 5 but was deadlocked and unable to reach a verdict on counts 1 and 2.

The jury convicted Flynn of count 3, forcible sodomy, count 4, lewd acts with a minor, and count 5, assault with intent to commit oral copulation by force. A mistrial was declared as to the other two counts.

Following the verdict, the defense filed a notice of intent to move for a new trial at sentencing. On April 22, 2011, the trial court denied the motion, sentenced Flynn to 14 years in state prison, and imposed various fines and penalty assessments.

11.

## DISCUSSION

Flynn contends the trial court erred when it excluded (1) prior statements made by the victim regarding sexual activity, and (2) evidence of the victim's reputation for defiance and violence. Flynn also claims the trial court (1) had a sua sponte duty to instruct the jury on the lesser included offense of nonforcible sodomy, (2) erred in refusing a special instruction that addressed Flynn's police interview and its admissibility, and (3) abused its discretion when it denied a motion for a mistrial. Flynn also asks this court to correct the abstract of judgment, which fails to state the breakdown of the aggregate amount of fees imposed at sentencing, and to review the school records of the victim to determine if the trial court released all documents referencing dishonesty, sexual activity, violent activity, illicit drug use, lack of sobriety, or other misbehavior.

## I. Evidentiary Rulings

### *False Statements of Sexual Conduct*

Sections 782 and 1103, subdivision (c) specify when and under what circumstances evidence of a victim's prior sexual behavior can be admitted in a trial of sexual assault charges. (*People v. Chandler* (1997) 56 Cal.App.4th 703, 707 (*Chandler*).) "The Legislature added section 782 and amended section 1103 to prevent a rape victim from being questioned extensively about any prior sexual history without a showing such questioning was relevant. (*California Rape Evidence Reform: An Analysis of Senate Bill* [*No.*] *1678* (1975) 26 Hastings L.J. 1551, 1555-1556.) The Assembly Criminal Justice Committee reasoned the fear of personal questions deterred victims from filing complaints and resulted in a low percentage of reported rapes. (*Id.* at p. 1554.)" (*People v. Casas* (1986) 181 Cal.App.3d 889, 895.)

Section 1103, subdivision (c)(1) provides that a defendant cannot introduce opinion evidence, reputation evidence, and evidence of specific instances of the alleged victim's previous sexual conduct with persons other than the defendant to prove the victim consented to the sexual acts alleged. In adopting this section, the Legislature

12.

recognized that evidence of the alleged victim's consensual sexual activities with others has little relevance to whether consent was given in a particular instance. (*Chandler, supra,* 56 Cal.App.4th at p. 707.)

While strictly precluding admission of the victim's past sexual conduct for purposes of proving consent, section 1103, subdivision (c)(4) and (5) allow the admission of evidence of prior sexual history to challenge the credibility of the victim. (*Chandler, supra*, 56 Cal.App.4th at p. 707.) Section 782 and 1103 protections do not apply when "the victim's sexual conduct is relevant to the victim's credibility." (*People v. Bautista* (2008) 163 Cal.App.4th 762, 782.) Where prior sexual conduct in the form of false statements or complaints about sexual activity is sought to be introduced as impeachment, not to prove the victim's willingness to engage in sexual conduct, the provisions of section 782 do not apply. (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1456 (*Tidwell*).)[2]

The trial court's evaluation and concern with prejudice to the victim must be weighed against the due process right of the defendant to present all relevant evidence of significant probative value. (*People v. Northrop* (1982) 132 Cal.App.3d 1027, 1042.) "A trial court's ruling on the admissibility of prior sexual conduct will be overturned on appeal only if appellant can show an abuse of discretion." (*Chandler, supra*, 56 Cal.App.4th at p. 711.)

Here, Flynn largely argued at trial, and maintains in this appeal, that the primary reason to admit A.A.'s various statements and postings about engaging in sexual activity is that they were false. The evidence of A.A.'s numerous false statements about engaging in sexual activity and numerous false accusations of having been raped allows the jury to draw a conclusion about A.A. based not on sexual conduct but on her stating

---

[2]At oral argument, the People conceded that section 782 did not apply and could not serve as a basis for exclusion of the proffered evidence.

as true something that was false. "The fact that a witness stated something that is not true as true is relevant on the witness's credibility whether she fabricated the incident or fantasized it." (*People v. Franklin* (1994) 25 Cal.App.4th 328, 335 (*Franklin*).)

That the trial court allowed minimal other evidence about A.A., such as her shoplifting escapades, does not mean that evidence of multiple prior false statements of rape and sexual activity should have been excluded. The other impeaching evidence was not of the same force and effect as the multiple false statements by A.A. regarding prior sexual activity. A.A.'s veracity was the crucial issue in this case and "a prior false complaint establishes an instance of dishonesty on the very issue hotly disputed .…" (*Tidwell, supra,* 163 Cal.App.4th at p. 1458.)

Several witnesses and A.A.'s own MySpace and social media postings demonstrated that A.A. made numerous statements detailing supposed sexual activity and accused multiple people of criminal conduct in relation to sexual activity with her.[3] These statements were highly relevant and established numerous instances of dishonesty by A.A. on the very issue that was disputed at trial. (*Tidwell, supra,* 163 Cal.App.4th at p. 1458.) Flynn was entitled to present this evidence to the jury and to have the jury evaluate the credibility of A.A.'s testimony about what happened with respect to the charges filed against him in light of A.A.'s demonstrated pattern of lying about sexual events and activities.

A.A.'s testimony about the incident and the circumstances surrounding the alleged forcible sodomy and assault with intent to commit oral copulation by force is somewhat inconsistent with the forensic evidence, thus creating an issue of credibility. The complete lack of any sperm, semen, or male epithelials on the anal, mouth, and lip swabs

---

[3]A.A.'s MySpace page was under the sexually explicit "Female - suckk ah dick!" and falsely claimed A.A. was 17 years old.

taken of A.A. creates doubt about the truth of A.A.'s testimony regarding the incident. This makes the excluded evidence probative.

The trial court's exclusion of A.A.'s prior false statements regarding sexual activity and her MySpace postings because it believed this evidence was "improper under the law" was a mistake. Likewise, the trial court's exclusion of the evidence because Flynn had failed to produce evidence that A.A. actually had engaged in all the sexual activity she claimed missed the point of the proffered evidence. The prior false statements and MySpace postings were admissible to challenge A.A.'s veracity and credibility and not excludable from evidence by section 782. (*Tidwell, supra,* 163 Cal.App.4th at p. 1458; *Franklin, supra,* 25 Cal.App.4th at p. 335.)

The trial court also excluded the evidence because of concerns about a potential undue consumption of time. We note the reporter's transcript was over 3,000 pages. The testimony at the evidentiary hearing encompasses only a small fraction of the trial transcript. Moreover, the trial court could have limited the number of witnesses who testified regarding A.A.'s prior statements and accusations to a reasonable number if Flynn had attempted to present a great number of witnesses, thus preventing any undue consumption of time. (*People v. Cudjo* (1993) 6 Cal.4th 585, 609.)

As the jury is the finder of fact, it is the jury's job to weigh the credibility of witnesses and draw reasonable inferences from the evidence. (See *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1463.) A.A.'s numerous false statements that she had been raped by several different people, her false claims of having been pregnant and undergone abortions, her false claims of having engaged in sexual relations with at least three different boys, and her MySpace postings were all relevant to show that A.A. frequently made detailed false statements about sexual activity. The evidence tended logically and by reasonable inference to prove the issue upon which it was offered and was not merely cumulative of the other impeaching evidence, which was unconnected to sexual comments or actions. (*People v. Harris* (1998) 60 Cal.App.4th 727, 739-741.)

15.

Alternatively, the various MySpace postings and statements made by A.A. regarding sexual activity potentially were relevant for another reason -- to attack her credibility when she testified she was a virgin. Whether A.A. was or was not a virgin at the time of the incident with Flynn does not affect her status as a victim. However, once A.A. has portrayed herself as a virgin and wrapped herself in a halo of innocence, then her past statements and MySpace postings become relevant to challenge her credibility around statements about sexual activity in a case where A.A.'s credibility is the key issue. (§§ 770, 1235; *People v. Johnson* (1992) 3 Cal.4th 1183, 1219.)

We thus conclude the trial court abused its discretion when it excluded the evidence.

### *Other Conduct Evidence Properly Excluded*

The trial court did not err, however, in excluding testimony that A.A. acts "horny and flaunts herself" when she drinks alcohol, that she had spiked adults' drinks so she could slip out to meet boys, or that she engaged in "groping" with boys. These actions were offered in an attempt to show that A.A. willingly engaged in sexual conduct with Flynn. California's rape-shield statute provides that in prosecutions for rape and other sex offenses, "opinion evidence, reputation evidence, and evidence of specific instances of the complaining witness' sexual conduct" cannot be introduced by the defendant "in order to prove consent by the complaining witness." (§ 1103, subd. (c)(1).)

Nor did the trial court err in excluding other evidence about A.A.'s nonsexual traits that Flynn sought to introduce. Evidence that A.A. had been disciplined in school for fighting, that she would sneak away from home and urge R.P. to do the same, that she had a reputation as a "spitfire," and similar actions unrelated to engaging in sexual acts simply were irrelevant to the issues and would only invite speculation. (*People v. Thornton* (2007) 41 Cal.4th 391, 444; *People v. Scheid* (1997) 16 Cal.4th 1, 13.)

*Prejudice*

Having concluded it was an abuse of discretion to exclude evidence, we assess whether the exclusion was prejudicial. We conclude it was prejudicial as to the forcible sodomy and assault with intent to commit oral copulation by force convictions, but not as to the conviction for lewd and lascivious conduct.

We first reject the People's contention that Flynn has forfeited any constitutional claims by failing to assert them in the trial court. The written motion filed by Flynn seeking to admit the evidence the trial court ultimately excluded specifically asserted a violation of constitutional rights would result from exclusion.

Flynn was charged with five counts; the jury convicted on three of the five counts and was unable to reach a verdict on the remaining two offenses. Prior to reaching its verdict, the jury sent a series of notes and questions to the trial court before returning a verdict. On March 15, 2011, the jury sent a note asking to review the testimony of A.A.'s aunt and of A.A.'s friend, R.P. On March 16 the jury asked to adjourn for the day for a "cooling off period from heated discussion." On March 17, the jury sent a note asking that the "attourney's argue 'consent.'" (*Sic.*) On March 18 the jury sent a note stating it wanted the attorneys "to focus on the evidence that supports consent or evidence that supports the lack of consent." On March 22, 2011, after approximately six days of deliberations, the jury sent a note stating it had reached a verdict on counts 3, 4, and 5 but was deadlocked and unable to reach a verdict on counts 1 and 2.

Clearly, the jury did not accept at face value all of A.A.'s testimony and was focused on whether or not A.A. had consented. Minors cannot legally consent to sexual intercourse. Even in sexual offenses against minors, however, there is a distinction between whether the acts were performed against the will of the minor or with the willing and voluntary participation of the minor.

In *People v. Young* (1987) 190 Cal.App.3d 248, the defendant was convicted of the forcible rape of a child under the age of 14 years. At the time of the offense, Penal

17.

Code section 261 defined rape "as an act of sexual intercourse accomplished with a person not the spouse of the perpetrator '[w]here it is accomplished against a person's will by means of force or fear of immediate and unlawful bodily injury on the person or another.'" (*Young,* at p. 257; see Stats. 1980, ch. 587, § 1, p. 1595.) The decision of the appellate court stated: "Where … the alleged victim is a child below the age of legal consent, whether the child has the capacity to 'consent' to an act of sexual intercourse within the meaning of [Penal Code] section 261.6 will usually be a question of fact. When it is charged that an act is against the will of a person, '"consent is at issue."'" [Citation.]" (*Young,* at p. 257.) The appellate court further stated that "in any sexual intercourse case involving a child-victim under the age of 14 … a defendant is subject to conviction of violations of [Penal Code] sections 261.5 (unlawful sexual intercourse with female under age 18) and 288, subdivision (a) (lewd or lascivious acts with child under age 14) even where the child consents to the sexual intercourse." (*Id*. at p. 257, fn. 2.) The appellate court thus properly recognized that a defendant might violate Penal Code section 261.5 without also violating Penal Code section 261, and that although a minor cannot give legal consent to sexual intercourse, he or she voluntarily and willingly can participate in the act and thus actually consent within the meaning of Penal Code section 261.6.

The evidence against Flynn on the forcible sodomy and the assault with intent to commit oral copulation by force charges was entirely A.A.'s testimony; there was no physical evidence connecting Flynn to these offenses. The anal swab of A.A. turned up no sperm or epithelial cells from Flynn; the same was true of the lip and mouth swab of A.A.

While the entire prosecution case against Flynn on the forcible sodomy and assault with intent to commit oral copulation by force counts hinged solely on A.A.'s testimony and her credibility as a witness, the conviction for lewd and lascivious conduct did not. The swab of A.A.'s leg contained her DNA and a partial DNA profile that fit Flynn's

DNA profile, and the swab of Flynn's penis revealed his DNA and a DNA profile in which A.A. was a likely contributor. The physical evidence demonstrated that, at a minimum, Flynn's penis came into contact with A.A.'s skin; consequently, the physical evidence supported the Penal Code section 288, subdivision (c)(1) offense.

The lewd and lascivious count did not allege it was committed by use of force, duress, or violence; the forcible sodomy and assault with intent to commit oral copulation by force alleged the acts were committed by use of force. As demonstrated by the jury's questions, whether A.A. was a willing participant (consent) was the crucial issue in the case.

Here, there were six days of deliberations, a failure to convict on all charges, questions from the jury seeking clarification around the concept of consent, and a lack of physical evidence supporting the counts 3 and 5 offenses. This was a close case. (*People v. Markus* (1978) 82 Cal.App.3d 477, 480.) The closeness of the case and the crucial issue of the credibility of A.A., combined with a lack of any substantial physical evidence to support the forcible sodomy and assault with intent to commit oral copulation by force, convince us the erroneous exclusion of the impeaching evidence was prejudicial on these two counts.

We recognize that the trial court eventually allowed Flynn to present evidence of one false accusation by A.A. against one person, which Flynn's defense counsel ultimately did not use. This does not dissuade us from our conclusion that exclusion of the evidence sought to be admitted by Flynn was prejudicial. One false statement about sexual activity, if raised in cross-examination, does not convey the same impression of A.A. as the entire body of the evidence excluded by the trial court. The jury may have received a significantly different impression of A.A., and specifically her truthfulness when speaking of sexual incidents, if the erroneously excluded evidence had been admitted. (*People v. Quartermain* (1997) 16 Cal.4th 600, 623-624.)

19.

The proffered evidence about A.A. presents a very different image of A.A. than that presented to the jury during the trial and calls into doubt her credibility around what happened in the incident with Flynn. Evidence establishing A.A. had a pattern of lying about, or seriously embellishing, incidents of sexual conduct, combined with a lack of physical evidence tied to Flynn, may have caused a reasonable jury to reach a different outcome on the forcible sodomy and assault with intent to commit oral copulation by force counts.

We conclude there is prejudice whether the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18 or the reasonably probable standard of *People v. Watson* (1956) 46 Cal.2d 818 is applied. We thus will reverse the convictions on counts 3 and 5.

## II. Lesser Included Instruction Issue Moot

In light of our reversal of the counts 3 and 5 convictions, the issue of whether the trial court sua sponte should have instructed on a lesser included offense to the count 3 offense is moot. Presumably, in any retrial of this offense, defense counsel affirmatively will request and the trial court will instruct on any lesser included offenses.

## III. Special Instruction and Mistrial

In related arguments, Flynn maintains the trial court erred when it denied his request for a special instruction that only the prosecution could offer into evidence his pretrial statement to the police. He also contends the trial court erred when it denied his motion for a mistrial after both the prosecution and defense mentioned the pretrial statement in opening arguments, but the statement never was admitted into evidence. As the only conviction that we are upholding is the conviction for lewd and lascivious behavior, we assess Flynn's claims only in relation to that conviction.

Assuming arguendo there was error, any error was harmless. The remarks about Flynn's pretrial statement made in opening argument were brief. The prosecutor stated Flynn denied inappropriate acts with A.A. when he spoke with officers. The defense

20.

responded that rather than a denial, Flynn's statement was that he could not remember what had happened that evening. Nothing in the comments about Flynn's pretrial statement, whether it be a denial or an inability to remember, was prejudicial to Flynn. Certainly, the jury understood Flynn was denying criminal liability by virtue of his not guilty pleas. The trial court instructed the jury that statements made by the attorneys were not evidence. We presume the jury followed the instructions. (*People v. Bennett* (2009) 45 Cal.4th 577, 612.)

Under the circumstances, neither the failure to issue a special instruction nor the denial of the mistrial motion was prejudicial.

## IV. School Records

Prior to trial, Flynn requested the trial court review in camera A.A.'s school records and disclose to the defense any records establishing dishonesty, sexual activity, violent activity, illicit drug use, lack of sobriety, or any other misbehavior. The trial court conducted an in camera review and disclosed two pages to the defense.

We have reviewed the school records and confirm that the trial court disclosed to the defense all appropriate documents.

## V. Abstract of Judgment

Flynn contends the abstract of judgment should be corrected to specify the basis for the penalty assessments imposed pursuant to Penal Code section 290.3. The People agree. A detailed recitation of the fees and fines must be set forth in the abstract of judgment. (*People v. High* (2004) 119 Cal.App.4th 1192, 1200-1201.)

Any errors in the abstract of judgment can be corrected on remand.

## DISPOSITION

The count 3 conviction for forcible sodomy (Pen. Code, § 286, subd. (c)(2)) and the count 5 conviction for assault with intent to commit oral copulation by force (Pen. Code, §§ 220, subd. (a) and 288a, subd. (c)(2)) are reversed. In all other respects, the

judgment is affirmed.  The matter is remanded to the trial court for preparation of a revised abstract of judgment and further proceedings.

_____
CORNELL, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
PEÑA, J.